IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JANE DOE | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 5:21-cv-00369 |
| KERRVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT | § | |
| | § | |
| Defendant. | § | |

---

### PLAINTIFF JANE DOE'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

**Q.**   What does your training – what have you been trained to understand sexual abuse to mean?

**A.**   *I mean, I think it is inappropriate contact . . . and recognizing that as – is the training is more about responding to the cry out of that than it is - - to necessarily go into how we would recognize that in a student.*

~Tivy High School Principal Shelby Balser

Not one. Not two. ***But three*** teachers sexually abused at least two, possibly three students at the ***same school*** in Kerrville Independent School District in ***one year***. They built their inappropriate sexual relationships with their student victims over time. Sexual harassment and sexual abuse are methods of discrimination forbidden by Title IX. Kerrville ISD let sexual harassment roam its halls, hang in the teacher's lounge, and read books in the library. When Jane, who was abused by two of those teachers, came forward, KISD made her regret it. KISD had information ahead of time in both situations but chose to ignore the facts. It knew the risks

but chose to keep its employees untrained. Now it asks the Court to dismiss Jane's case.[1]

Kerrville Independent School District is wrong. This is a case for a jury to see the evidence, hear the testimony, and watch the witnesses. Credibility calls need to be made and that's something only a jury can do. The District's motion should be denied.

## MEET THE WITNESSES KISD DECIDED NOT TO BRING



These Kerrville Independent School District administrators had the duty and responsibility to protect Jane and every other student under their watch from teacher sexual abuse, teacher sexual harassment, peer-on-peer sexual harassment, and retaliation. These are the people the District's Board of Trustees chose to communicate and demonstrate KISD's policies to employees, students, and the community. Under their watch, ***three teachers*** sexually abused ***at least two, possibly three students*** at the ***same*** school in ***less than one year***. Jane was sexually abused by two of its teachers, ridiculed and sexually harassed by teachers and students,

---

[1] Jane asks the Court to hear oral argument on Defendant's motion. This is a fact-intensive case, involving multiple actors and multiple theories of law, and oral argument would be beneficial for those reasons.

and subjected to profound retaliation.

Now the District wants to kill her case before a jury can hear its administrators testify. Its motion puts their knowledge, their conduct, their intentions, and their practices at issue. One would expect a motion raising those issues to include testimony from these administrators and attach District documents associated with Jane and what happened to her. KISD chose not to do that here. It left the depositions of its employees out of the record and offered Jane's deposition as proof of the District's knowledge, conduct, intentions, and practices.

Jane took the depositions of five district witnesses. Those depositions exposed credibility concerns, just a few of which are briefly summarized below but discussed in greater detail in the appendix. Jane is not asking this Court to decide any of these issues of credibility; however, they are examples of exactly why this case should be decided by a jury.

Example One: SRO Paul Gonzales, a third-party witness, met with KISD's lawyers to discuss his testimony in front of the team of defense witnesses, who had vested interests in swaying him away from damning facts voluntarily told Jane's counsel after leaving his position at KISD. During that conversation, the SRO freely admitted that KISD administrators blamed Jane for Edwards' abuse and Mr. C's subsequent inability to resist temptation, only to have sudden memory loss at deposition and suddenly claim that asking him direct, non-tricky questions was unprofessional. Gonzales then went to lunch with Wade Ivy and KISD's lawyer in the middle of his deposition. Doe App. ¶¶79–81.

Example Two: KISD's witnesses and its two former employees consistently responded "*I don't remember*" and "*I can't recall the specifics*" (or similar phrases) to questions about the conversations at the time of the underlying events. They often followed by refusing to answer

questions for even their general recollections, claiming that answering without perfect recollection amounted to speculation. Later, Jane found the source of their "I don't know perfectly so I can't answer at all" mantra. Handwritten notes from meetings with KISD's counsel taken by Balser (white) and Cook (blue) revealed the answer. Doe App. ¶¶ 82–83.



Example Three:  Dr. Kendall Young also testified after leaving her position with KISD. KISD delayed informing Jane it would not be representing her for purposes of the deposition, which delayed getting her testimony. During the deposition, Plaintiff asked Dr. Young if teachers made hostile comments about Jane having relationships with male teachers during class after her dismissal. Before Dr. Young could answer, KISD began instructing her not to answer even though she was a third-party witness. When Jane objected, KISD's counsel started giving Dr. Young unsolicited legal advice. Sometime after a text informing the witness that sure could answer whatever question was pending before her. Doe App. ¶¶ 84.

## OBJECTIONS TO KISD'S SUMMARY JUDGMENT EXHIBITS

**I.      Ivy is not an Expert and Cannot Testify on Ultimate Issues.**

Jane Doe objects to the District offering Wade Ivy as an expert on the adequacy of training or policies in preventing educator sexual misconduct, sexual assault, sexual harassment, or discrimination on the basis of sex in any form. Ivy has not been disclosed as an expert nor

qualified as one. *See* FED. R. CIV. P. 26. Therefore, Ivy can testify to matters within his personal knowledge, but he cannot opine on ultimate issues of fact. FED. R. EVID. 701, 702.

## II.     Objections to Ivy Declaration And Attachments

**Ivy Declaration ¶ 7**: This paragraph includes a hyperlinked website address for the current online version of Kerrville ISD's board policy manual. Doc. 51–4, Ivy Dec. ¶ 7. Jane objects to the admission of the hyperlink and any information linked through that address as part of the summary judgment record as irrelevant. *See* FED. R. EVID. 401, 402. Jane further objects to the admission of the District's current policies as inadmissible subsequent remedial measures that Defendant is not offering for a permissible other purpose. FED. R. EVID. 407.

**Ivy Declaration ¶ 9 and Ex. B-16 through B-20**: This paragraph claims that the District "provides information to *employees*, *administrators* and *parents* regarding the recognizing and reporting sexual misconduct in postings, website information, professional boundaries self-assessments, and website information. Ex. B-16, Ex. B-17, Ex. B-18, Ex. B-19, Ex. B-20." Ivy Dec. ¶ 9 (emphasis added).

Ivy's statement in ¶ 9 is inadmissible for several reasons. First, the statement itself is conclusory and therefore insufficient to support a motion for summary judgment. *Stagliano v. Cincinnati Ins. Co.*, 633 F. App'x 217, 220 (5th Cir. 2015) (citations omitted). For instance, Ivy claims that the District provides information about sexual misconduct to employees, administrators, and parents through "postings", but he does not explain: (1) what the postings are made, (2) where staff, administrators, and parents would find such postings, or (3) identify the source, author, or provide any details about the actual contents of such postings. Ivy also references "website information", but again fails to describe where to find the website

information, its source, its contents, or how to locate the unspecified information. Ivy's statement does not even confirm KISD provided the information at the relevant time.

The string citation to "Ex. B-16, Ex. B-17, Ex. B-18, Ex. B-19, Ex. B-20" at the end of the paragraph does not render the statement any less conclusory because: (1) the declaration doesn't identify the names of the documents associated with those labels, and (2) the exhibits to the declaration are not label by exhibit number. *See* Ivy Dec. 1–5; Doc. 51–5 to Doc. 51–35 (omitting exhibit labels). It is impossible to confirm, <u>on the face of the Ivy Declaration</u>, whether any of the documents Ivy identified in that string citation are the documents filed with the declaration.

Even if it were permissible to use the list of exhibits from Defendant's appendix as a means of speculating which documents Ivy cited in ¶ 9, KISD cannot rely on that statement or the documents referenced for the proposition it provided the information contained in those documents to *employees, parents, and students* because Ivy does not explain the method of communication or identify a temporal reference for it. Therefore, relevance cannot be established. *See* Fed. R. Evid. 401, 402. Jane also objects to the attachments as inadmissible hearsay to which no exception applies. Fed. R. Evid. 801–803.

Jane further objects to Doc. 51-22, which appears to be a screenshot of a portion of KISD's website containing Title IX documents. The webpage pictured was not the webpage that existed at the time of the underlying events. First, Superintendent Dr. Mark Foust was the Title IX Coordinator at all relevant times to Jane's case. Second, the webpage pictured displays a tab entitled "Remote Conferencing" which originated as a result of the COVID-19 pandemic following Jane's graduation.

**Ivy Declaration ¶ 10 and Ex. B-21 through B-32**: This paragraph claims: "One of the ways Kerrville ISD provides training to its employees, staff, students, and the community members is via PowerPoint Presentations. Attached as Ex. B-21, Ex. B-22, Ex. B-23, Ex. B-24, Ex. B-25, Ex. B-26, Ex. B-27, Ex. B-28, Ex. B-29, Ex. B-30, Ex. B-31, Ex. B-32."

Again, Ivy attempts to string cite unnamed exhibits and connect them to unlabeled documents. Ivy has not established personal knowledge, relevance, or lain the propre evidentiary foundation to admit them. *See* FED. R. EVID. 401, 402. Jane also objects to the attachments as inadmissible hearsay to which no exception applies. FED. R. EVID. 801–803.

**Ivy Declaration ¶ 13**: Ivy cannot act as a business record sponsor for unmarked exhibits that his declaration does not also identify by name. *Compare* Ivy Dec. ¶ 7 (associating specific names with Exs. B-1 through B-11) *with* ¶¶ 9 & 10 (giving bulk citations to exhibit numbers).

## SUMMARY OF THE ARGUMENT

Kerrville ISD is not entitled to summary judgment on any of Jane Doe's claims. First, the motion suffers from procedural deficiencies in its challenges to teacher-student sexual harassment, the deliberate indifference element of that claim, and peer-on-peer sexual harassment. It wholly fails to address one of Jane's well-plead causes of action and neglects its initial summary judgment burden on deliberate indifference and the entire peer-on-peer hostile environment claim.

KISD's motion fails on the merits too. It raised arguments that revolve around what KISD knew, how KISD behaved, KISD's intent, KISD's policies, and KISD's training practices. And then brought the Court a nearly slim record, devoid of case-related records and silent with absent witnesses. A jury should decide this case. Jane's response, relying on witness testimony, records

created at the time directly related to events at issue in this case, and testimony from experts for both parties can show: (1) the appropriate persons had actual knowledge of each sexually abusive teacher, (2) KISD acted with deliberate indifference, (3) retaliation was prevalent and directly tied to the protected actions she took, (4) KISD's official policies were the moving force behind the multiple violations of her 14th Amendment right to bodily integrity, and (5) training employees to be willfully blind shows absolute deliberate indifference and directly caused multiple violations of Jane's right to bodily integrity.

## ARGUMENTS AND AUTHORITIES

**I.**   **A Reasonable Jury Would Find KISD Liable for Jane's Title IX Teacher-Student Sexual Harassment Claims when Presented with the Evidence Before this Court.**

The District's motion for summary judgment on Jane's teacher-student sexual harassment hostile environment claims should be denied. First, the motion does not address all of Jane's Title IX hostile environment claims based on teacher-student sexual harassment. Second, there is evidence that KISD administrators had actual knowledge of Edwards' abuse and of Chatagnier's abuse. (Jane does not address the claim KISD failed to raise.) Finally, this Court need not reach the element of deliberate indifference because Defendant's rote recitation of the law, with nothing more, did not shift the burden to Jane.

**A.**   **KISD's motion does not address all of Jane's Title IX hostile environment claims for teacher-student sexual harassment.**

Jane's Original Complaint sets out <u>three</u> distinct teacher-student sexual harassment hostile environment claims against KISD.[2] The first arises out of Defendant's deliberate

---

[2] *See Woodfork v. Marine Cooks & Stewards Union*, 642 F.2d 966, 971 (5th Cir. 1981) (citations omitted) ("A cause of action, in common legal parlance, is a state of facts which would entitle a person to sustain an action and to seek a judicial remedy on his behalf.).

indifference to teacher-student sexual abuse by Edwards. Doc. 1, Orig. Compl. ¶¶ 55–79. The second arises out of Defendant's deliberate indifference to teacher-student sexual abuse by Chatagnier. *Id.* at ¶¶ 55, 80–91. And the third hostile environment claim arises out of verbal harassment perpetrated by Principal Balser and several teachers. *Id.* at ¶¶ 55, 70–72, 86–91.

> **B.    Administrators at the top of KISD and Tivy High School knew about both educators' sexual misconduct.**

Under Title IX, a school district like KISD may be held liable when evidence shows a school official with authority to address the harassment had actual knowledge of the harassment or that there was a substantial risk that harassment would occur, and the school was deliberately indifferent to such harassment. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998). KISD argues that knowledge an appropriate person must have supervisory authority over the harasser, but that supervisory power standard argued by the District does not apply to this post-*Gebser* case. An "appropriate person" under Title IX is an official with authority to take corrective action to end the discrimination." 524 U.S. at 290.[3] Whether an employee is an "appropriate person" who had "actual notice is a question of fact." *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 384 (5th Cir. 2000).

In this case, Assistant Superintendent Wade Ivy and Tivy High School Principal Shelby Balser were <u>first-hand witnesses</u> to concerning behavior *and* served as the <u>information repository</u> for other employees-first hand observations. As KISD's Assistant Superintendent of Personnel and Administration, Wade Ivy taking corrective action to address discrimination was

---

[3] It left the "supervisory power" requirement adopted by the Fifth Circuit in *Rosa H. v. San Elizario Independent School District* out of the definition. See *Gebser*, 524 U.S. at 291; see also *Sneed v. Austin Indep. Sch. Dist.*, 490 F. Supp. 3d 1069, 1085 (W.D. Tex. 2020).

part of his job. Doe App. ¶¶ 65–66. The same is true for Principal Balser and Assistant Principal Cook, addressing sexual harassment reports from staff and students was just part of their jobs. Doe App.¶ 4; *see also* TEX. EDUC. CODE § 11.202. With respect to Edwards, Chief Fred Brunz was also an appropriate person. Mot. Summ. J. ¶16. SRO Gonzales and Dr. Kendall Young, while both appropriate people, also shared their knowledge with Ivy and Balser. Under these facts, Defendant's appropriate person challenge fails.

> **1.    Balser, Cook, and Chief knew JROTC students were saying Edwards engaged in oral sex with Jane <u>four months</u> before her outcry.**

A plaintiff can establish actual knowledge by direct evidence of that knowledge. *See Roe v. Cypress-Fairbanks Indep. Sch. Dist.*, 53 F.4.th 334, 341 (5ᵗʰ Cir. 2022). A school district must have either actual knowledge the harassment occurred, actual knowledge it is occurring, or know that the is a substantial risk that sex abuse would occur." *Id.* (citations omitted). In the last instance, the official must both have the facts necessary to know that a substantial risk of serious harm exists and also draw the inference. *See id.* (citations omitted). Stated differently, a plaintiff must present evidence of the facts the relevant individual(s) knew and show that those facts raise a question of fact on substantial risk of serious harm. *See id.* If that fact issue is established, a jury should be permitted to evaluate the credibility of the witness on the issue of whether or not the person drew the inference.

The facts available to Balser, Cook, and Chief Brunz during the second semester of Jane's freshman year are enough to make reasonable minds reach different conclusions on the issue of substantial risk of serious harm.  Four months before the September outcry officials at the high school knew that students in the JROTC were making jokes and actively talking about their instructor having oral sex with Jane Doe. The discussions were explicit, and even Edwards

considered those discussions to be an outcry against himself.  In fact, it was one of the first things he mentioned before Assistant Superintendent Ivy told him to stop talking and leave campus.

Doctor Shakeshaft explained that rumors and jokes about students and teachers (as opposed to other students) like the one reported in May 2017 tend to have so reason. Shakeshaft Dep. at 54–60. If training had been done, administrators like Cook would have located information that identified the educator sexual misconduct earlier. Dr. Shakeshaft further elaborated:

> There's a lot to indicate that the rumor had validity. Maybe not for the specific action, but certainly overall for the behaviors of the Colonel. So, yes, there was plenty to find based upon that rumor of misconduct, and yet no one did anything.

Shakeshaft Dep. at 30:1-9. Indeed, the information contained in the "joke" was explicit: "While waiting after school in the JTRO I was using school glue and I got some on my knees. [Male classmate] started that I was 'making pads for Colonel when I would go down on him and that glue looked like the aftermath when the Colonel was finishing with me.'" Doe App. pp. 30-31.

Chief Brunz also had authority over Edwards and teacher-student sexual misconduct. As the only other JROTC instructor, it is reasonable to infer that Chief Brunz was informed of the oral sex statement because it affected so many cadets and resulted in one cadet leaving the program. Chief Brunz was also the first individual to leave Edwards and Jane alone together, at school, at night, after the winter JROTC dance.[4] KISD's motion claims that Jane's testimony contradicts the statement in her Complaint that Chief "Chief Brunz 'noticed that Colonel Edwards gave Jane lots of hugs.'" *Id.* However, KISD does not mention that its documents from

---

[4] Doe Dep. at 22:2–24:23, 25:19–28:18.

after Jane's September 2017 outcry <u>confirm</u> exactly that Edwards received a lot of hugs from Jane, who also spend a lot of time in the JROTC offices, and the nature of the hugs was significant enough to make him uncomfortable. Doe App. pp. 30-31.

Brunz, Cook, and Balser were not the only employees with information about the sexual nature of Jane and Edwards' relationship. For instance, the undisputed evidence shows SRO Gonzales, who had the authority to participate in investigations performed by the school as well as investigations performed by the police, noticed Jane's interaction with Edwards while she was sitting in a hallway with her legs up and spread. Doe App. ¶¶ 39–42. The SRO described Jane as looking promiscuous and noted that Edwards did not ask her to sit correctly in the chair. *Id.* Chief Brunz was present and standing near Edwards when SRO Gonzales witnessed this event. *Id.* Other teachers on Jane's schedule would have been impacted by the Colonel's attachment to Jane.

The evidence also shows that Jane spent an extraordinary amount of time with Edwards outside of her normal class period and that she was recognized as a teacher's pet. . Between December 13, 2016 and May 26, 2017, Edwards wrote Jane **twenty-four hall passes** to get to and from the JROTC room. (Plaintiff's Motion for Leave to Seal, Ex. B-13) The two even sat next to each other under a blanket on the bus home from an overnight trip. By that point, the rumors were already circulating in the JROTC and it is reasonable to infer rumors of that were discussed in the presence of Chief Brunz.

Considering this evidence in the light most favorable to Jane, the evidence establishes the people with authority had the underlying facts necessary to determine there was a substantial risk. To the extent Defendants deny drawing the inference, that should be a matter

for the jury to decide based on whether or not the jurors believe the witnesses.

### 2.    District and school officials knew about Chatagnier but turned their heads.

KISD had actual knowledge that Chatagnier was engaged in educator sexual misconduct. That statement is definitely true as of April 28, 2018, when an eyewitness told Principal Shelby Balser that Chatagnier and Jane were wearing matching t-shirts from an out-of-town car show *and* that she saw Jane say the words "we hooked up" referring to having intercourse. Principal Balser testified that she understood that statement to be a reference to sex. Doe App. ¶¶62, 68–69. Principal Balser relayed that information to Ivy as well. *See* Ex. B-7, Sealed Handwritten Notes of Wade Ivy 04/2018.

At that point, Assistant Superintendent Wade Ivy and Principal Balser, had after-the-fact actual knowledge of sexual abuse that had already taken place.[5] *See J.T. v. Uplift Edu.*, No. 3:20-CV-3443-D, 2023 WL 4207462, at *3 (N.D. Tex. Jun. 27, 2023). Things did not have to get that far. They had before-the-fact knowledge too. It could have been stopped as early as February—before Chatagnier could act out on his sexual intentions.

Evidence shows both KISD's assistant superintendent and Tivy High School's principal had assessed the facts known to them as of February 13, 2018, and inferred that a substantial risk of harm from educator sexual misconduct existed on those facts. According to KISD's letter to the SBEC, Balser and Cook met with Mr. C at Tivy on February 7th to tell Mr. C that he needed to keep Jane out of his classroom outside of her assigned class. That night, Mrs. Doe emailed Ivy

---

[5] KISD obtained a declaration from Wade Ivy. It attempts to lay the evidentiary foundation for policies, procedures, and address training. *One simple but telling thing is missing*— **a denial of knowledge**.

about Jane's ability to get tutoring from her math teacher. Doe. App. ¶¶ 54-56. Based on the contents of the email, it's clear that the instructions Balser gave Chatagnier earlier that day had been relayed by the teacher. *Id.* And it is also clear that Balser had by that point connected the dots between Mr. C's behavior and inferred was a substantial risk of ESM because Mrs. Doe would not have had to make this heartbreaking statement otherwise— "But, the ONE thing that has weighed heavily on me and my husband is that the principal . . . would **dare warn a teacher of my daughter's intentions** and basically communicate to him to **watch out as she was complicit** in what happened with Edwards." Doe App. Ex. A-19.

Jane's account of the meeting with Ivy that took place on February 13th further supports the conclusion. Doe App. Ex. B-15 (seal); *see also* Def.'s Ex. A-1 (same pages). That meeting was set because of the tutoring issue KISD created by telling Mr. C to keep Jane away. *Id.* Ivy suggested that it would be best for everyone if Mr. C and Jane did not have conversations on campus. *Id.* He deduced that doing so would help Jane not do further harm to her reputation and look better for Tivy's reputation. *Id.* Jane going to Mr. C's classroom, given her reputation for liking teachers, looked like she was having another relationship with a teacher. *Id.* She was informed, that it was inappropriate for her to visit a male teacher's room after what had happened. *See id.* Chatagnier's sexually motivated relationship did not progress to physical sexual contact until Chatagnier began having to take Jane to Schreiner University's library for tutoring. Doe App. ¶ 11.

There was also actual knowledge of facts showing a substantial risk of harm from educator sexual misconduct on March 2, when Dr. Young witnessed Jane on her knees behind Mr. C's desk. SRO Gonzales and Christopher Cook, both of whom were not provided the detailed

information about the event when it happened, confirmed that they would have viewed that as sexual in nature, mandatorily reported to CPS/Police, and made a report to the district had they been aware of that information. Doe App. ¶¶ 13 & n.31.  Again, reasonable minds looking at the information Ivy and Balser when Dr. Young reported the desk incident, could reach different conclusions.

These fact issues only become firmer as additional information from between March 2, and April 27th made its way to Ivy and Balser's repository. *See* Doe App. ¶¶ 61-69, 80, Ex. B-8 (sealed). Ivy and Balser didn't get their information from just one source or at just one time.  They collected facts about Chatagnier's relationship with Jane on a number of occasions from a number of sources over the course of several months. *See N.B. v. San Antonio Indep. Sch. Dist.*, No. SA-05-CA-0239-XR, 2007 WL 4205726, at * 5 (W.D. Tex. Nov. 27, 2007) (citations omitted).

KISD's witnesses deny making the inference that Chatagnier's relationship with Jane was sexual, but their actions and the extrinsic evidence contradicts their self-interested attestations. Summary judgment should be denied.

**C.    KISD failed to shift the burden on deliberate indifference.**

Just as the District acted with deliberate indifference to three instances of teacher-student sexual harassment, its motion demonstrates deliberate indifference to the summary judgment rule and the well-settled law interpreting it. *Compare* Mot. Summ. J. ¶ 17 *with Bailey v. Ramos*, No. 20-CV-00466-XR, 2023 WL 2147700, at *11 n.12 (W.D. Tex. Feb. 17, 2023) (publication pending) ("The Court will not presume that [the movant] has met his burden on summary judgment simply by virtue of having filed a motion."). The burden Rule 56 imposed on KISD is simple and clear, but KISD ignored it.

KISD's motion devotes a single paragraph to deliberate indifference to teacher-student sexual harassment. Mot. Summ. J. ¶ 17. The paragraph leads with a conclusory sentence claiming Jane can't establish deliberate indifference. *Id.* A few of the frequently cited, boilerplate quotes about deliberate indifference follow. *Id.* And then the discussion stops. *Id.* Stated differently, KISD made absolutely no effort to point to relevant excerpts from pleadings, discovery, or affidavits that demonstrate the absence of genuine factual issues. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

The District is not entitled to summary judgment on the deliberate indifference element of Jane's teacher-student sexual harassment claims. Additionally, Jane objects to any attempt to cure that KISD may make in its reply. As shown below, genuine fact disputes exist so giving the District a do-over would be meaningless.

### D.   A reasonable jury could and would find KISD acted with deliberate indifference on all three teacher-student sexual harassment claims.

Once a school district is on notice of a problem, the school district has a legal duty to take reasonable steps to eliminate the sexually hostile environment. *See Sneed*, 490 F.Supp. 3d at 1086–87. Though a high bar, deliberate indifference is a fact-intensive inquiry. *See id.* (citations omitted). Both doing nothing in response to known discrimination and acting in a way that is clearly unreasonable in light of the known circumstances qualify as deliberate indifference. *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 648 (1999). A plaintiff can also establish deliberate indifference when a Title IX recipient's deliberate indifference to initial discrimination subjected the plaintiff to additional discrimination. *See Williams v. Bd. Regents Univ. Sys. Ga.*, 477 F.3d 1282, 1296 (11th Cir. 2007).

In Jane's case, KISD did nothing with regard to both Edwards and Chatagnier for months

in both cases. The report of cadets talking about Edwards engaging in sex acts with Jane for months but shoved it in a cabinet and paid the report no further mind. Meanwhile, the conduct continued, and the rumors increased until Jane finally burst into tears. Very soon the damage to Jane's JROTC dreams was done because KISD did not respond to the ongoing sexual harassment and retaliation delivered on her from her fellow cadets and classmates.

KISD's deliberate indifference to the post-resignation sexual harassment retaliation ion that Jane endured from administrators and teachers subjected Jane to further and ongoing harassment. Indeed, it is the deliberate indifference to the verbal sexual harassment and retaliation the employees threw at her that put Jane on a collision course with Mr. C (who already knew she was a victim thanks to KISD). Doe App. ¶¶ 50–59. To date, other than the May 2017 oral sex report, KISD has not produced any physical evidence showing it investigated any of the sexual <u>harassment</u> or retaliation reports Jane or her parents made.

Finally, the probability of a reasonable jury looking at the evidence and taking in the totality of the circumstances would find that KISD's actions were clearly unreasonable regarding Chatagnier. The District had so much information, from so many different, credible sources for such a long period of time and made the intentional choice not to investigate. *See* Balser Dep. *supra.* When a disinterested, trusted student informed Tivy's principal that she had seen Jane say "we hooked up" about Chatagnier while wearing matching shirts from an out-of-town event, Principal Balser wrote it off as unfounded. The District did too, voluntarily misinforming the SBEC that evidence or suspicions of ESM did not exist. Doe App. Ex. A-2. Defendant's   motion should be denied.

## II.    KISD Failed to Shift the Burden on Jane's Peer-on-Peer Sexual Harassment Claim.

This Court need not reach the merits of the District's summary judgment challenge because it did not meet its summary judgment burden. KISD's motion doesn't even contain a boilerplate list of the essential elements of peer-on-peer sexual harassment hostile environment claims. Mot. Summ. J. ¶¶ 18–19. It appears to continue its arguments against Jane's teacher-student sexual abuse claims instead. This blatant disregard dishonors the summary judgment rule and the initial burden it imposes on KISD. *See* FED. R. CIV. P. 56.

A party moving for summary judgment on a claim where the nonmovant bears the burden at trial doesn't even have to bring evidence to conclusively negate the claim, it just has to inform "the district court of the basis of its motion and identify[] those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323. The fact that moving parties can't just make conclusory no evidence assertions or merely list a claim's elements and state the non-movant has no evidence has long been settled law. *Shelton v. Wise*, No. A-07-CA-063 RP, 2009 WL 10699966, at *5 (W.D. Tex. Feb. 23, 2009). KISD did not even make an effort to do that.

Simply put, the summary judgment burden hasn't shifted to Jane. *See Shelton*, 2009 WL 10699966 at *5 (holding one citation to the movant's expert "that he couldn't 'think of anything' beyond the alleged illegality of [Plaintiff's} arrest" that could support liability was "hardly sufficient to carry even their initial burden" in an excessive force case).

KISD should not be permitted to cure these defects after such a blatant disregard and Jane objects to any future attempt to do so. The motion should be denied. Alternatively, should the Court decide to consider arguments related to peer-to-peer sexual harassment, Jane asks the Court to afford her leave to address the same.

III.     **Every Time Jane Reported Sexual Harassment, KISD made her Regret it.**[6]

Title IX prohibits school districts from retaliating against a person who speaks out against or reports sex discrimination. *Jackson v. Birmingham Bd. of Edu.*, 544 U.S. 167, 171 (2005). Protecting against retaliation is critical to protecting students from sexual harassment. *See id.* at 180–81. When retaliation goes unchecked the underlying sex-based discrimination perpetuates, allowing "all manner of Title IX violations" to go unremedied. *Id.* at 180 (citation omitted). To prove Title IX retaliation, a student must show that the school district retaliated against her/him/them *because* the student complained of sex discrimination. *Id.* at 184.

The claim has three elements (1) engaged in a protected activity; (2) suffered an adverse [] action; and (3) a causal link exists between the protected activity and the adverse action. *Collins v. Jackson Pub. Sch. Dist.*, 609 Fed. Appx. 792, 795 (5th Cir. 2015) (citation omitted). Courts examine motion for summary judgment on Title IX claims for retaliation under the familiar *McDonnell-Douglas* framework of Title VII. *See, e.g., Minis v. Bd. of Sup'rs of La. State Univ. & Agr. & Mech. Coll.*, 620 F. App'x 215, 222-23 (5th Cir. 2015). The third element— which addresses the school district's motivations—may be proven through direct or circumstantial evidence in a Title IX case just as it can in Title VII cases. *Id.*

 Jane's retaliation claim isn't based on classroom management. She made a lot of sex discrimination reports during the final two years she was enrolled in KISD, including:  Outcries of sexual abuse by both teachers, Reporting sexual harassment by teachers, reporting sexual

---

[6] And, once again, the basis for KISD's summary judgment challenge to Jane's retaliation is blurry at best. The motion doesn't cite a single case or clearly identify the elements of retaliation that it contends Jane cannot prove beyond passing conclusory comments that classroom management isn't retaliation and denying a causal link. *See* Mot. Summ. J. ¶¶ 20–25. As a result, out of an abundance of caution, this response addresses each element.

harassment by peers, insisting to be provided Title IX rights, such as being provided information and documentation related to the Kerrville ISD's response to her sexual discrimination reports, requesting to be allowed to stay at Tivy High School after Kerrville ISD asked her to leave, requesting Kerrville ISD respond to previous reports of the hostile environment created by other students attacking her with sexual slurs and taunts because of the sexual abuse her teachers perpetrated, requesting Kerrville ISD respond to repeated reports of the hostile environment created by her teachers opening referring to her abuse in front of other students and punishing her for reporting it, requesting interim measures, asking the principal not call her complicit in abuse, and even asking for a copy of her student education records in order to investigate her potential claims against Kerrville ISD.

Kerrville ISD responded to those protected acts with retaliation throughout her time enrolled in the District and as recently as March 2021. As described in greater detail above, Kerrville ISD blamed Jane for its teachers sexually abusing her. Doe. App. *passim.* Principal Shelby Balser identified her to every teacher at Tivy High School during the sexual abuse and harassment "training" meeting within weeks of her outcry about Colonel Edwards. Doe Dep. at 98-114. The school principal that was supposed to protect her told those teachers Jane Doe was complicit at that training. Doe App. ¶¶ 50-60. It discusses three examples of teachers using Edwards' sexual abuse and Mr. C's obvious fixation to publicly sexually shame Jane as if those actions form the entire factual basis of Jane's claim. *See* Def.'s Mot. ¶¶ 20-23.

As tensions about Mr. C's interactions with Jane at school grew in February and March 2018, KISD began pushing Jane to leave Tivy HS and transfer to Hill Country High School. Doe App. ¶¶ 70-74. Jane refused. *Id.* On April 11, 2018, KISD changed her status to academically "at

risk" even though she didn't meet the definition. *Id.* A transcript printed that day shows she was ranked #47 out of 353 students in her class. After the math teacher resigned, she gave in and transferred. It stripped her of her class rank. *Id.* A few months later, she requested transcripts for college admissions, the school didn't get the ones for higher-ranked universities in on time, despite her request. *Id.* Prior to bringing this action, KISD delayed giving her education records to her and interfered with her ability to investigate her claims.

The temporal proximity and circumstantial evidence establish a fact issue on causation and retaliatory intent. Defendant's motion should be denied.

## IV. Repetitive Educator Sexual Misconduct in One Place Over a Short Time Creates Genuine Fact Questions about Official Policies and Training Practices.

Three teachers sexually abusing at least two and possibly three students at the same high school in the span of one year does not happen without unconstitutional official policies or deliberate indifference to providing adequate training. KISD's motion for summary judgment on Jane's § 1983 claims based on official policy should be denied. Jane's summary judgment evidence shows the actions of an official policymaker for KISD deprived Jane of her 14th Amendment right to bodily integrity. It also establishes that KISD's official policies and customs were the moving force behind the violation of Jane's 14th Amendment rights. Testimony from KISD's administrators, KISD's own documents, and the experts show there are genuine fact issues that a jury should decide.

Jane's § 1983 claim for failure to train also survives KISD's summary judgment challenge. KISD has not produced any admissible evidence on the issue of training. The Ivy Declaration's conclusory statements about training are inadmissible. The Declaration's citations to strings of exhibit numbers for unnamed documents does not lay the necessary evidentiary predicate to

admit the series of unlabeled, hearsay documents attached to the declaration. Additionally, even if that material was admissible, KISD's witnesses, documents, and Jane's expert directly contradict KISD's claims.

A.     **KISD's official policies violated Jane's 14th Amendment right to bodily integrity.**

To establish a § 1983 claim for municipal liability pursuant to *Monell v. Dep't of Social Servs. of the City of N.Y.*, 436 U.S. 658 (1978), a plaintiff must present evidence that: (a) an "official policy" promulgated by (b) a "municipal policymaker" was (c) the "moving force" behind the violation of a constitutional right. *Webb v. Town of St. Joseph*, 925 F.3d 209, 215 (5th Cir. 2019). The policy element of Monell can be met in three ways:

> **First**, a plaintiff can show written policy statements, ordinances, or regulations. **Second**, a plaintiff can show a widespread practice that is so common and well-settled as to constitute custom that fairly represents municipal policy. **Third**, even a single decision may constitute municipal policy ... when the official or entity possessing final policymaking authority for an action performs the specific act that forms the basis of the § 1983 claim.

*Id.* (citations omitted). In this case, the second applies.

The summary judgment record shows that KISD had a widespread practice of disengaging its Title IX Coordinator participating in the District's response to Title IX complaints. This disengagement involved: (1) preventing interface between the Title IX Coordinator and complainant, (2) not providing complainants notification of Title IX rights, (3) violating KISD written policy requirements that apply only to the Title IX Coordinator, (4) no transparency in the Title IX Coordinator's role in investigation, (5) having a no-documentation policy in all matters related to the Title IX coordinator's involvement or lack thereof in investigations, and (6) limiting coordinator involvement in training. Doe App. ¶¶ 78; Ex. A-9, Balser Dep. at 82-

100:23, 129-143, 169-178, 238-240; Ex. A-8, Cook Dep. at 38-41, 152-155, 200-203; Ex. A-7, Ivy

Dep. at 56-64, 70-75, 122-129, 148-169; Ex. A-5, Thompson Dep. at 62-68, 72-76, 85-105, 114-

120, 142-149, 161-164, 182-184, 205 (and cited deposition exhibits).

This widespread practice happened 100% of the time in the series of complaints invoking

Title IX that Jane made between 2017 and 2018.[7] The District's Title IX policies require the Title

IX Coordinator to make initial decisions about each initial claim. *See* Def.'s FFH. Those decisions

determine what set of policies and procedures apply to resolving the complaint going forward.

*See id.* For instance, is the conduct reported discrimination that is based on sex and prohibited

under FFH or is it simply bad behavior to which policies about bullying would apply? This is

important because how complaints are coded affects how those complaints get reported to

regulatory agencies, such as the Department of Education's Office of Civil Rights and the Texas

Education Agency. *See e.g.*, Doe App. Ex. B-3 (sealed).

None of the sex discrimination complaints that Jane or someone on her behalf made

between May 2017 and November 2019 were processed according to KISD's FFH policy. Doe

App. ¶¶ 78; Ex. A-9, Balser Dep. at 82-100:23, 129-143, 169-178, 238-240; Ex. A-8, Cook Dep. at

38-41, 152-155, 200-203; Ex. A-7, Ivy Dep. at 56-64, 70-75, 122-129, 148-169; Ex. A-5, Thompson

Dep. at 62-68, 72-76, 85-105, 114-120, 142-149, 161-164, 182-184, 205.

According to KISD, despite being sexually abused by two teachers, sexually harassed by

students and other employees, and retaliated against, KISD only investigated one report of

sexual discrimination made by Jane. The Title IX Coordinator made *zero* initial reports and met

---

[7] Those would include: May 2017 cadet sexual harassment report, September 2017 Edwards outcry, 2017 -2018 school year complaints related to sexual harassment by fellow peers including the JROTC, and 2017 to 2018 school year complaints related to verbal sexual harassment and retaliation by employees including Principal Shelby Balser.

Jane *zero* times. *See id.*

A policy is the "moving force" behind a constitutional injury when evidence shows the "policy itself was unconstitutional" or it was adopted with "deliberate indifference to the known or obvious fact that such constitutional violations would result." *Webb*, 925 F.3d at 221. Deliberate indifference is a degree of culpability that goes "beyond mere negligence or even gross negligence." *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009). The degree of indifference demonstrated "amount[s] to an intentional choice, not merely an unintentionally negligent oversight." *Id.* at 617–18.

From May 2017 through her graduation in November 2018, Jane withstood and endured repeated sexual harassment in the form of assault, retaliation, and verbal humiliation. KISD didn't choose to disengage its Title IX Coordinator just once or twice, it disengaged the Title IX Coordinator 100% of the time— including in the *one* Title IX investigation the District performed. That deliberate indifference is something a jury should consider and get to decide liability on. Jane asked this court to deny Defendant's motion on this ground.

**B.    KISD's Failure to Train Violated Jane's 14th Amendment right to Bodily Integrity.**

Not one. Not two. ***But three*** KISD employees from one high school sexually abused students over the course of one year. That's not an accident. It's not a coincidence. It is a pattern. It is not a coincidence. It's a pattern born from KISD's deliberate indifference to training its employees about educator sexual misconduct.[8]

"'Failure to train' claims are most commonly premised on a pattern of incidents in which

---

[8] *See* Cook Dep. at 199:8–203:1.

citizens were injured and which show that failure to train was an official policy of the municipality." *Moreno v. Northside I.S.D.*, No. SA-11-CV-746-XR, 2013 WL 3716531, at *4 (W.D. Tex. July 12, 2013) (citing *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir.1998); *Valle v. City of Houston*, 613 F.3d 536, 547 (5th Cir.2010), *cert. denied*, 131 S.Ct. 1094 (2011)). A plaintiff must show that (1) the municipality's training policy or procedure was inadequate; (2) the inadequate training policy was a "moving force" in causing violation of the plaintiff's rights; and (3) the municipality was deliberately indifferent in adopting its training policy. *See, e.g., Sanders–Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir.2010).

Jane has that evidence in this case. This Court need look no further than the testimony of Principal Shelby Balser to find evidence supporting Jane's failure to train claim:

> Q.   And now let's move on to sexual abuse. What does your training -- what have you been trained to understand sexual abuse to mean?
>
> A.   I mean, I think it is inappropriate contact, unwanted and inappropriate contact and recognizing that as not - - is the training is more about responding to the cry out of that than it is to - - necessarily go into what we would recognize that in a student . . . [i]t's really what to do in the event that you have a cry out for sexual abuse purposes.[9]

The high school principal goes on to elaborate that, the definition of educator sexual misconduct KISD gave her requires sexual contact. Doe App. ¶¶ 20-25. KISD trained its employees to watch for blurred lines and crossed boundaries. *Id.* If boundaries are being crossed, KISD employees are trained to "look closely." *Id.* KISD did not train Balser that looking closely meant considering whether or not a sexual or romantic relationship is actually present, but rather to see which party is blurring the line (student or teacher). *Id.*

---

[9] Balser Dep. at 60:25–61:12.

In fact, KISD administrators are not supposed to consider whether a teacher crossing boundaries is engaged in sexual misconduct unless they hear from the student, the teacher, or someone else that there has been sexual contact. This is a completely reactive approach that violates the purpose of Title IX and puts children in danger. *See* Doe. App. ¶¶ 17-38.

Dr. Shakeshaft explained how the training Balser described added to the danger Jane faced with Chatagnier:

> I would also say that – that – that it wasn't just the students who saw them together, it was teachers in the hallways, teachers across the hallways, teachers across – across the – in the classrooms and other places. So – so even though we might have not identified specific people, I think it's important to understand that, in schools, you see a lot of things, and teachers who are next door, teachers who are across the hallway, teachers who are collaborating.
>
> So if you were concerned about Mr. C and the – the chance that Mr. C might be crossing boundaries - - well, not the chance. We already knew he was crossing boundaries, and he was told to stop crossing boundaries. They didn't follow up on that, nor did they investigate, nor did they ask other teachers, What do you see going on? Is there anything that is happening, Is there anything that you see? There was just no investigation at that time when they might have had a chance to stop this from happening.

Doe App. ¶ 24.

As discussed above, KISD failed to provide this Court with any admissible evidence regarding its training practices for administrators, teachers, students, or families. The Ivy Declaration is wholly inadmissible on this issue. The conclusory statements about training lack any temporal reference or insight into who gets what training. Moreover, it contradicts the testimony witnesses provided in their depositions as well as the very limited training records KISD produced to Jane and to its expert. Doe Dep. ¶¶ 26-38. Indeed, the undisputed evidence shows KISD provided the bare minimum (or even less) training to its employees and no training at all to students and their families. *Id.*

Again, Dr. Shakeshaft explained what makes an adequate policy adequate to protect from educator sexual misconduct:

> Well, I would say all individuals, including students I give examples of students who saw things and who would actually say those things in front of employees. Those were things that employees should have picked up on and reported as a concern.
>
> . . . I gave an example, for instance, of a – of a school counselor who saw things and didn't intervene to stop what was going on. I have examples of a principal who didn't – who didn't respond to what students said until after the misconduct started.
>
> So I have examples of people in the school and – and students in the school who knew what was going on or who – who, if they didn't know specifically, definitely were identifying red flags and warning signs for people to pick up on.

Doe App. ¶ 19.

A policy that deliberately ignores prevention is a policy that deliberately allows sexual misconduct to happen. The fact that three teachers in one high school in less than a calendar year engaged in educator sexual abuse is evidence that a jury should hear and decide. Kerrville ISD's motion should be denied.

## <u>PRAYER</u>

For these reasons, Jane Doe asks the Court to strike the objected to exhibits from the summary judgment record, deny Kerrville Independent School District's Motion for Summary Judgment, and for such other relief to which she may be justly entitled.

Respectfully Submitted,

  /s/ Heather Lynn Long
Heather Lynn Long
Texas Bar No. 24055865
heather@heatherlonglaw.com
**Heather Long Law PC**
4310 North Central Expressway
Dallas, Texas 75206
Phone: (214) 699-5994

Amos L. Barton
Texas Bar No. 24031847
Abarton@carlsonattorneys.com
**The Carlson Law Firm, P.C.**
301 Junction Highway, Suite 100
Kerrville, Texas 78028
Phone: (830) 257-7575
Fax:     (830) 257-7580

**ATTORNEYS FOR JANE DOE**


## CERTIFICATE OF SERVICE

A true and correct copy of this Motion was filed with the Court and served on all parties through the Court's electronic filing system on July 17, 2023 with a supporting Motion for Leave to follow.

  /s/ Heather Lynn Long
Heather Lynn Long