IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JANE DOE | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. |
| | § | 5:21-CV-00369 |
| KERRVILLE INDEPENDENT | § | |
| SCHOOL DISTRICT | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF JANE DOE'S APPENDIX STATEMENT OF MATERIAL FACTS & STATEMENT OF DISPUTED FACTS

Jane submits this Appendix and its exhibits in support of her Response in Opposition to Defendant's Motion for Summary Judgment.

## STATEMENT OF MATERIAL FACTS

This is a fact laden case because the sexual discrimination Jane Doe experienced as a Kerrville ISD student came from multiple sources and went on over a long period of time:

1. Teacher-student sexual abuse by JROTC instructor Christopher Edwards from December 2016 through September 2017.

2. Verbal teacher-student sexual harassment by multiple individuals— Principal Shelby Balser and multiple teachers on her staff—from September 2017 through late 2018.

3. Peer-on-peer sexual harassment that started in spring 2017 with Jane's fellow cadets in the JROTC and spread outwards to other students and increased throughout the school year.

4. Teacher-student sexual abuse by math teacher Aaron Chatagnier that started around November 2017 and ended shortly after KISD allowed him to resign in lieu of termination on April 30, 2018.

The facts are organized by issue; however, some facts go to more than one issue. The evidence submitted and cited below establishes that genuine disputes about material facts exist on all the issues raised in Defendant's motion.

## I.    A pattern of teacher-student sexual abuse and sexual harassment existed in KISD.

1.    Educator sexual misconduct is a national epidemic.[1] That does not mean school employee sexual misconduct is inevitable.[2] Students and teachers depend on district and campus leaders to ensure student safety from educator sexual misconduct.[3]

2.    Kerrville ISD found itself facing a public relations crisis in during the first three weeks of the 2017–2018 school year.[4] In a matter of days, the District received complaints about two separate teachers at Tivy High School sexually abusing at least and, possibly, three high school students.[5] It responded by sending a letter to every parent and guardian in the district.[6] That letter contained the date of each report and explained that both teachers had been put on leave while the district investigated. *Id.* That letter effectively identified Jane as one of the victims.[7]

---

[1] **Ex. A–5,** David P. Thompson, Ph.D. Dep. ("Thompson Dep.") at 201:9–202:11, Dep Ex. 5–8; **Ex. A–6,** Charol Shakeshaft Ph.D. ("Shakeshaft Dep.") at 164:2–176:1; *see also* Def.'s Ex. B16 at 2–3 (citing U.S. Department of Education, Office of the Under Secretary, Educator Sexual Misconduct: A Synthesis of Existing Literature, Washington, D.C., 2004 by Charol Shakeshaft, Ph.D.)).

[2] Shakeshaft Dep. at 185:6–22.

[3] Thompson Dep. at 204:5–10, Dep Ex. 12; Shakeshaft Dep. at 55:9–56:15, 164:2–176:1.

[4] **Ex. A–13,** KISD 2017–2018 School Calendar; **Ex. A–11,** 09/13/2017 Public Disclosure Letter; **Ex. A–12,** 09/15/2017 Public Disclosure Letter; *see also* **Ex. A   7,** Assistant Superintendent Wade Ivy Dep. ("Ivy Dep.") at 169:1—183:25; **Ex. A-32,** September 15, 2017 Snap Chats Naming Jane (also referenced as Exhibit 6 to Ivy's Deposition).

[5] **Ex. A–1,** KISD Edwards SBEC Report; **Ex. A–2,** 2018 KISD Chatagnier SBEC Report; **Ex. A–3,** KISD D'Spain SBEC Report; **Ex. A–4,** 2020 KISD Chatagnier SBEC Report.

[6] 09/13/2017 Public Disclosure Letter; 09/15/2017 Public Disclosure Letter.

[7] **Ex. A–24,** Mrs. Doe Dep. at 37:27-40:15; **Ex. A– 8,** Assistant Principal Chris Cook Dep. ("Cook Dep") at 58:25-69:25; September 15, 2017 Snap Chats (Mrs. Doe provided these to snap chats to Ivy during the early morning hours of September 15th. The students chatting knew Jane was one of the victims. The one with that information claimed to

3.      Jane Doe's outcry about ongoing sexual abuse by her JROTC instructor came first.[8] Evidence establishes that Tivy administrators knew the JROTC cadets were talking about the instructor having oral sex with Jane four months earlier.[9] and that the school's other JROTC instructor witnessed frequent hugs between his counterpart and Jane that made him uncomfortable during the same timeframe.[10] Even the JROTC instructor that abused Jane —Lt. Colonel Christopher Edwards— considered the student-on-student harassment about oral sex as an outcry about his conduct.[11]

4.      In fact, it was one of the first things he said during his one and only "conversation" with KISD Assistant Superintendent Wade Ivy, Tivy Principal Shelby Balser, and Assistant Principal Chris Cook about the outcry before Ivy stopped him from confessing and sent him home. *Id.* School administrators would never get an opportunity to speak with him again.[12] Had Ivy interviewed Edwards or let him continue to talk, anything Edwards said to the group of administrators could have been used against him in a criminal prosecution through their testimony and contemporaneous notes. *Id.* Edwards lawyered up later the same day. *Id.* He has never been criminally prosecuted for the things he did to Jane. *Id.*

5.      Unlike the perpetrator himself, school administrators treated the oral sex report as a

---

have four sources—two at KISD (as in the district, not "at Tivy"), one at the courthouse, and one at the police.  Wade Ivy did not speak to the student to find out more about the leak); **Ex. A–7,** Assistant Superintendent Wade Ivy Dep. ("Ivy Dep.") at 170:1-183:25.

[8] *See e.g.*, Edwards SBEC Rep.

[9] *Id.*

[10] *Id.* at 2693–2694,2701–2707, 2711.

[11] *Id.* at 2701.

[12] Ivy Dep. at 150:18–157:23.

student discipline issue and tucked it away in a cabinet where it would have likely remained hidden but for Edward's statements.[13] Tivy didn't have a formal filing system for complaints like that, a person would need prior knowledge to find those documents. *Id.* Cook testified, based on KISD's regular practices and the nature of the student's discipline, the oral sex report would have also gone through Principal Balser at the time it was made in May 2017. *Id.*

6.      Both KISD's expert, Dr. David Thompson, and Jane's expert Dr. Charol Shakeshaft testified that report should have been treated as peer-on-peer sexual harassment.[14] Moreover, KISD's SRO and trained Kerrville Police Officer Paul Gonzales was not informed of the oral sex comments from May 2017.[15] Gonzales testified that **he would have treated the oral sex report from May 2017 as a report of educator sexual misconduct** and responded by: "I would have – **I would have obtained any and all information from the school side of the investigation**, and then I would have **notified the investigator and provided that information**." *Id.* (emphasis added). No one told Dr. Kendall Young, Tivy's lead counselor with a doctorate of education, about the oral sex rumors from May 2017 either.[16] KISD has provided zero evidence that Tivy administrators reported the May 2017 sexual harassment to him as the district's written policies

---

[13] Cook Dep. at 34:1–37:25, 93:19—113:4.

[14] Thompson Dep. at 42:15-75:24, 112:16–123:23, 128:1–135:12 (Agreeing that the oral sex comment was sexual harassment, that the Title IX Coordinator did not participate as required by KISD's written policies, and no evidence Cook or Balser complied with policies that required them to notify the Coordinator); Shakeshaft Dep. at 28:4–32:22, 47.2:25–46:5,56:16-69:3, 85:22–93:3, 107:1-109:25, 185:23–197:3 (Explaining that student rumors at that age usually have some connections with the students' observations. Dr. Shakeshaft further explained that comments by peers like the oral sex comment are red flags that reasonable district officials investigate.).

[15] **Ex. A–10**, SRO Paul Gonzales Dep. ("SRO Dep.") at 77:1–79:18.

[16] **Ex. A–15**, Kendall Young, EdD Deposition ("Young Dep.") at 136:2–14,

and procedures required.[17]

7.      Administrators interviewed Jane about Edwards on Friday, September 8, 2017. The following Monday a male student walked into Principal Shelby Balser's office with partially nude photos of librarian and licensed teacher, Sarah D'Spain.[18] The pictures came from a male student who reported both rumors of an ongoing relationship between D'Spain and a male student as well as the photo(s) of the employee circulating around the school. *Id.* Unlike in Jane's case, administrators interviewed other students, not just the student who walked into Balser's office and the victim. *Id.* It was discovered that D'Spain shared her photos with the current student and met him off campus where the two kissed and she allowed him to feel her breasts. *Id.* Information also surfaced that D'Spain and her library aid from the prior school year had a sexual relationship where at least the seeds of romance arguably started on campus. *Id.*

8.      KISD's administrators could have used Gonzales to assist in the district's investigation of any bullying, sexual harassment, or teacher-sexual misconduct allegations, but they chose not to do so in regard to any of the sexual abuse, harassment, retaliation, and discrimination reports made by or on behalf of Jane.[19] They chose not to, so the SRO monitored school safety without a full picture of what was going on. KISD allowed both Edwards and D'Spain to resign in lieu of termination.

9.      KISD decided to call all of its Tivy employees into the library the week after the second

---

[17] Thompson Dep. at 42:15-75:24, 112:16–123:23, 128:1–135:12; *see also* Docs. 51-5 through 51-12 (KISD written policies).

[18] D'Spain SBEC Rep., **Ex. A–9,** Principal Shelby Balser Dep. ("Balser Dep.") at 98:1-101:3, 165:7-176:25; Ivy Dep. at 63:23-68:25; SRO Dep. at 25:5-55:22,69:1-74:19.

[19] SRO Dep. at 10:18-46:6, 66:12-80:9, 85:13-90, *passim*.

outcry.[20] Assistant Superintendent Ivy and Principal Basler ran the meeting. *Id.* Dr. Mark Foust did not attend. *Id.* Assistant Principal Cook attended, he testified: "The only comments I recall are teachers are worried about being falsely accused of something and seemed like there was a discussion, you know, **what protections they have and if they're randomly accused of something.**"[21] That was the discussion as soon as the teachers walked in. *Id.* Cook recalled Administrators spent most of their time telling the teachers how to protect themselves. *Id.*

10.     That pointed the second Kerrville ISD teacher-child abuser directly to Jane. Within two months of her outcry, the Tivy math teacher had Jane in his grasp.[22] Principal Balsar was <u>watching Jane</u> and her interactions with that teacher.[23] The predator did not even try to hide his possessiveness, it come Kerrville ISD administrators and other Tivy teachers picked up on the inappropriate sexual intimacy. So did the students at Tivy High School.[24]

11.     By spring semester Jane was living in a world of rumors and hostile remarks when she went to school— *slut , hot for teacher, head to see her "male teacher friends"* were all part of her regular day.[25] KISD did not like the optics of Jane, a prior teacher's sexual desire, spending time with another male teacher.[26]  In early February 2018, KISD's Assistant Superintendent called

---

[20] **Ex. A-22**, 09/20/2017 Library Meeting Notes.

[21] Cook Dep. at 156:1-165:14.

[22] **Ex. A–14**, 12/06/2017 Chatagnier Email re Jane; **Ex. A–19**, 02/07/2018 Mrs. Doe Harassment Reports to Ivy.

[23] *See* Balser Dep. at 194:215:8 (and cited exhibits).

[24] *See* Doe Dep. at 115:1-118:25, 154:1—183:23 (discussing teacher comments about seeing her male teacher friend); Balser Dep. at 170:186:19; 193:10-200:25, *passim*.

[25] Doe Dep. at at 115:1-118:25, 154:1—183:23.

[26] KISD's employees now deny viewing Jane as the person at fault for Edwards's actions, but those denials are not beyond reproach, but there is evidence of the contrary. SRO Gonzales' total about-face during deposition is one example.

Jane and her parents into a meeting. Jane described what happened in her **sealed deposition**

**transcript**.[27] According to Doe, the rumors about a relationship between her and Mr. C had

already been going around. *Id.* They did not begin a physical relationship until they followed Ivy's

instructions and started meeting at Schreiner University's library after school. *Id.*

12.      In April 2018, KISD could no longer pretend it didn't see the relationship when the math

teacher and Jane came to school wearing matching t-shirts from an out-of-town festival. That

same day a student informed Principal Balser that she had seen Jane say that they "hooked up"

while sitting in math class.[28]  Balser recognized the phrase as referring to a sexual act, told Ivy

about the report, and both decided on their own that it was not really evidence of a sexual

relationship.[29] They allowed him to resign, like the other abusers, in lieu of termination and

considered the matter done. *Id.*

13.      KISD's administrators kept that information to Tivy's SRO, CPS, Jane's parents, and the

SBEC.[30] Again, SRO Gonzales testified KISD had a mandatory obligation to report potential

educator sexual misconduct as soon as it received the hooked-up report (and also before due to

events witnessed in March 2018 that are discussed below).[31]

---

[27] **Ex. B-15**, Demonstrative Excerpt Jane Doe Dep. Doe Dep. at 115:7—14, 116:20-117:8 (emphasis added), *see also* 117:9-118:25.

[28] Balser Dep. at 228:1-242:25, Dep. Ex. 7.

[29] *Id.*; *see also* Cook Dep. at 124:14-145:14, Dep. Ex. 5.

[30] *Id.*; 2018 Chatagnier SBEC Letter; SRO Dep. at 121:9-136:23 (Gonzales confirmed KISD did not share information it had about Jane behind Mr. C's desk on her knees looking up at him in his chair or the hook up statement made while wearing matching shirts. That information would have triggered his obligation as a mandatory reporter, and he would have made a report if KISD told him.)

[31] *See* March 2, 2018 Kneeling Behind Desk Email; Young Dep. at 118:12-143:5; SRO Dep. at 128:1- 136:23; Cook Dep. at 126:14-146:25.

14.     Gonzales had the same mandatory obligation and would have reported. *Id.* This would have forced KISD to report as well and eliminated KISD's ability to control the narrative in its report to SBEC. *See id.*

15.     After Chatagnier resigned in lieu of termination, Principal Balser told parents with students in his classes: "I am writing to inform you that your student's math teacher, Aaron Chatagnier, has resigned his position for personal reasons."[32] Tivy's assistant principal admitted including "for personal reasons" in the letter made the statement inaccurate. *Id.*

16.     It took KISD learning that Kerrville Police Department opened an investigation into Chatagnier's relationship with Jane, to do the right thing and tell the SBEC about the true nature of the relationship until it was forced to in 2020.[33]

## II.     KISD didn't train teachers or other employees to protect students from educator sexual misconduct.

17.     Training is an integral part of educator sexual misconduct prevention.[34] Administrators need training. Teachers and staff need training. Students and their parents or guardians need training. *Id.* Training should include learning to identify what Dr. Shakeshaft calls "red flags" — warning signs of misconduct and reporting warning signs. *Id.*

18.     Materials like handbooks are not training. *Id.* Few students or parents even read them. *Id.* Thus, having a student handbook is not the same thing a s training students. *Id.*

19.     According to Dr. Shakeshaft, "the failure to train actually led to the situation of Jane

---

[32] Cook Dep. at 136:19-144:17, Dep. Ex. 5.

[33] *See* Mrs. Doe Dep. at 87:16-89:25; Doe Dep. at 178:14-187:25; **Ex. A-27**, Emails with Brunz; **Ex. A-35**, KISD Friday Reports.

[34] Shakeshaft Dep. at 22:9-26:2, 78:10-82:24, 85:1-96:24,

Doe."[35] She could not find an example of any employee who said that he/she/they were adequately trained to report the warning signs of educator sexual misconduct. *Id.* She also couldn't find any evidence that students were provided training on the topic. *Id.* Dr. Shakeshaft explained:

> Well, I would say all individuals, including students I give examples of students who saw things and who would actually say those things in front of employees. Those were things that employees should have picked up on and reported as a concern.

> . . . I gave an example, for instance, of a – of a school counselor who saw things and didn't intervene to stop what was going on. I have examples of a principal who didn't – who didn't respond to what students said until after the misconduct started.

> So I have examples of people in the school and – and students in the school who knew what was going on or who – who, if they didn't know specifically, definitely were identifying red flags and warning signs for people to pick up on.[36]

20.     KISD trained Principal Shelby Balser that educator sexual misconduct required "engaging in a sexual relationship or sexual contact with a student."[37]  KISD trained her that it "has policies and procedures in place for the boundaries between an educator and a student" and if "those are crossed, then it would cause us to look at that closely but it does not mean that we would make the leap to *this is sexual misconduct*." *Id.* (emphasis added).

21.     KISD trained its educators that "looking closely" in that context means to look at "where the lines are blurred" to decide which party (i.e. student or teacher) in the relationship doesn't understand his/her/their role.

---

[35] *Id.* at 22:9–25:1, 78:10-82:24, 85:1-96:24,

[36] *Id.* at 24:11-25:1, *see also* 25:2-26:9, 28:5-34:14, 38:1-40:12, 42:25-47:3, 47:16-56:5,.

[37] Balser Dep. at 62:12-64:5, 68:5-70:10, *see also id.* at 40-98, 51:22–52:15, 53:8–54:19.

22.     According to KISD's training, "looking closely" at a situation where educator boundaries have been crossed **does not** include investigating ***whether or not there has been sexual contact***. (Keep in mind KISD trains its employees that educator sexual misconduct requires sexual contact.) *Id.*

23.     KISD's administrators are trained not to even consider whether a teacher crossing boundaries is having sexual contact with a student ***unless*** the student, the teacher, or someone else says that there has been contact. *Id.*

24.     Dr. Shakeshaft explained how the training Balser described added to the danger Jane faced with Chatagnier:

> I would also say that – that – that it wasn't just the students who saw them together, it was teachers in the hallways, teachers across the hallways, teachers across – across the – in the classrooms and other places. So – so even though we might have not identified specific people, I think it's important to understand that, in schools, you see a lot of things, and teachers who are next door, teachers who are across the hallway, teachers who are collaborating.
>
> So if you were concerned about Mr. C and the – the chance that Mr. C might be crossing boundaries - - well, not the chance. We already knew he was crossing boundaries, and he was told to stop crossing boundaries. They didn't follow up on that, nor did they investigate, nor did they ask other teachers, What do you see going on? Is there anything that is happening, Is there anything that you see? There was just no investigation at that time when they might have had a chance to stop this from happening.[38]

25.     Balser admitted KISD did not train teachers at her school to recognize the signs of sexual abuse. She confessed: "the training is more about responding to the cry out of that than it is to -- to necessarily go into how we recognize that in a student."[39]

---

[38] Shakeshaft Dep. at 49:20-50:13.

[39] Balser Dep.at 60:25–61:15.

26.     The limited training transcript records KISD produced, *see e.g.* Ex. A-30, do not support the proposition that KISD's educators had adequate training. It's the opposite, in fact.[40]   For instance, Superintendent and Title IX Coordinator Dr. Mark Foust had a sum total of **0.5 hours** of sexual harassment training during the relevant timeframe. *Id.*

27.     Jane requested Records maintained by KISD that include the name of every Tivy employee who participated in training for: child abuse reporting, prevention, anti-victimization and retaliation, warnings signs, sexual harassment and bullying, educator sexual misconduct, and factors that indicate a child is at risk for sexual abuse.

28.     The District said it would supplement. *Id.* The supplement only contained training transcripts for D'Spain, Edwards, and Chatagnier.[41] Kerrville ISD has not produced training records for Balser, Ivy, Cook, Young, Gonzales, Jones, Starry, McCommak, Chief BRunz, or any other employees. During deposition, Ivy admitted he did not have any Title IX training when he responded to Jane's reports of sexual harassment.[42]

29.     The transcript KISD produced for D'Spain didn't include any training in educator sexual misconduct, sexual harassment, Title IX, or appropriate educator-student boundaries. Not a single sexual misconduct, sexual harassment, Title IX, or appropriate educator–student boundary course appears in the training transcript produced by KISD in this case. [43]

---

[40] **Ex. A-30,** Def.'s Rsp.2nd RFP at No. 10; Young Dep. at 55:11-23 (explaining CPS training certificates should be in employee files and confirming the CPS training and online exam were the only training KISD employees received about recognizing ESM); *compare to* **Ex. B-12,** Sealed Employee File (no CPS training certificates) **Ex. B-13,** Sealed Employee File (no CPS training certificates).

[41] Def.'s Rsp.2nd RFP (transcripts for D'Spain, Foust, Chatagnier, and Edwards (supplementation came without bates numbering)).

[42] Ivy Dep. at 56:1-65:1.

[43] KISD R-2nd RFP (containing training transcripts for D'Spain, Edwards, Chatagnier, and Foust).

30.     The Colonel received two **workplace** sexual harassment courses according to his transcript.[44] No evidence exists those courses addressed educator sexual misconduct. *See id.* Mr. C's transcript reveals two **workplace** sexual harassment courses prior to the time he began sexually abusing Jane and one "Teachers & Students- Personal Boundaries" course on March 7, 2018. *Id.*

31.     KISD didn't provide Jane or its expert with any copies its annual sexual harassment training for the relevant time period between 2016 and 2018.[45] Dr. Thompson admitted that he was not aware of any training KISD provided to identify the warning signs of educator sexual misconduct on children. *Id.*

### III.    KISD's failure to train parents and students about Title IX or educator sexual misconduct exposed Jane to sexual abuse.

32.     The District left Jane and its other students exposed to sexual abuse, sexual harassment, and retaliation by both KISD employees and peers.[46] It made the conscious and calculated choice not to train KISD students or their parents and guardians on educator sexual misconduct, sexual harassment by employees or peers, retaliation, Title IX, reporting procedures, or victim rights.[47] Not providing that crucial training left Jane and her classmates, like victims of Librarian D'Spain, vulnerable to statistically relevant danger.

33.     Kerrville Independent School District **knew** educator sexual misconduct was a <u>national</u>

---

[44] KISD R-2nd RFP, Response No. 20 and attached production (Jane requested training from 2016-2019, KISD provided the screenshots of 2021-2022 web-based training. The attached training focuses almost entirely on workplace sexual harassment.).

[45] *Id.*; Thompson Dep. at 209:25-244:15 (and cited deposition exhibits).

[46] Shakeshaft Dep. at 163-218; Thompson Dep. at 224:1-244:15 (and cited exhibits).

[47] Doe Dep. at 66:3–15, 67:3–8; Mr. Doe Dep. at 14.

problem and it *knew* training employees, students, and families was critical to preventing this kind of abuse.

34.     It did not provide any training in spotting, preventing, or dealing with sexual abuse.[48] Handbooks, contrary to Defendant's claims, are not training. [49] Very few people understand them or read them. *Id.* The handbooks KISD relies on and its policies are not proof of training as those don't even give examples of the signs of sexual abuse and grooming or how to handle those situations if they exist. *Id.*

35.     Principal Balser also made "English Class Presentations" the week *after* KISD Superintendent and Title IX Coordinator Dr. Foust made public statements containing details that made Jane Doe easily identifiable to her teachers and classmates.[50] That speech cannot be considered training. It doesn't even mention anything about teacher-student sexual harassment or sexual boundaries. *Id.*

36.     The speech did undermine Jane's credibility as a victim to the student body. It referred to the abuse reports as "allegations" even though the District had already determined the Colonel and D'Spain committed educator sexual misconduct." *See id.*

37.     KISD's failure to train parents also increased Jane's exposure to educator sexual misconduct.[51] Jane's parents thought that Mr. C could be of help to their daughter, but they weren't trained educators. It was up to the school district to inform them that Mr. C was crossing

---

[48] *See* Shakeshaft Dep. at 146-168.

[49] *Id.* at 22-26.

[50] **Ex. A–23**, Balser English Student Talk (referring to the September 13, 2013 public teacher-student sexual abuse letter as occurring "last week").

[51] Shakeshaft Dep. at 48:10-50:13, 52:25-53:15.

boundaries, why the boundaries he was crossing are concerning, and "make it clear [to the parents] that this could be a dangerous situation." *Id.*

38.     In situations like the one KISD had before it, where a teacher had been warned about boundaries multiple times and kept crossing them, schools are expected to talk to the parents about grooming, including the very common practice of grooming parents. *Id.*

**IV.     KISD knew of and ignored Edwards's sexual misconduct until Jane's outcry forced action.**

39.     Principal Balser and Assistant Principal Cook found out cadets in JROTC were talking about the Colonel having oral sex with Jane **four months before** Chief Brunz reported Jane's outcry.[52] KISD's failure to train employees on how to identify and prevent educator sexual misconduct put Jane in additional danger.[53] Adequately trained educators presented with the information Cook and Balser received in May 2017 ask questions about the behavior between the adult and the student (Jane). *Id.*

40.     That report did not just act as a red flag indicating that there was substantial risk of sexual misconduct.[54] In the field of education, a statement like the student made in May 2017 is considered a report of possible educator sexual misconduct. *Id.*

41.     SRO Gonzales was watching Edwards and Doe prior to the outcry on September 7, 2017— or at least that is a reasonable inference to draw from his testimony.[55] He observed her in short

---

[52] Edwards SBEC Rep.

[53] Shakeshaft Dep. at 28:1–33:15, 4:25-45:11, 58:2-65:7; *see also id.* at 66-69 (explaining that the situation called for two investigations — one into the peer-on-peer sexual harassment and the other into the relationship between the Colonel and Jane).

[54] *Id.* at 78:13-85:25.

[55] SRO Dep. at 81:15-82:25, 107:25-119:5.

shorts sitting in what he called a promiscuous way in front of Edwards. *Id.*

42.     On September 6, 2017, Jane walked out of the JROTC room into Chief Brunz's office in tears. *Id.* She told Chief that she needed to speak to him and Edwards together. *Id.* The Chief witnessed Jane confront Edwards. *Id.* Jane described the confrontation from her point of view during deposition, explaining that she was crying and talking through tears while asking the Colonel to admit the inappropriate relationship.[56] When Edwards finally responded to Jane, she remembered him saying "I suppose it could be seen as inappropriate." *Id.* Jane walked away in tears after that and had no further contact with Edwards. *Id.*

43.     Chief Brunz described the events similarly, except for one **key** distinction— he heard Edwards confess to the relationship.[57] He quoted Edwards: "Okay, I was wrong." *Id.*

44.     Jane walked away after Edwards' admission. *Id.* Chief did nothing. *Id.* Jane went on to her other classes distressed and in tears.[58] One of her other teachers recognized Jane was having an emergency and let Jane call her mother from the hallway. *Id.* Standing in a public hallway at Tivy, Jane spent thirty minutes telling her mother what Edwards had done to her. *Id.* She went back to class after the call, but the teacher didn't ask her about what was making her so upset. *Id.*

45.     Finally, at the end of classes, Jane went back to talk to Chief Brunz. *Id.* It was still, according to Jane's sworn testimony, September 6, 2017. Jane told Brunz that she needed the relationship with Edwards to stop. *Id.* Brunz respond by telling her that she needed to be really firm about what she was about to tell him and that she "*couldn't make jokes to him anymore*". *Id.*

---

[56] Doe Dep. at 89:15–25.

[57] *See* Edwards SBEC Rep. at 2711.

[58] Doe Dep. at 90:17–91:8, 92:10–96:16.

Jane told Brunz that Edwards wanted to have sex with her and had asked to have sex with her. *Id.* After that, Jane left Chief in his office and went to meet her mom for a ride. *Id.* She did not see the Colonel again after the confrontation that Jane and Chief both identified as taking place on September 6, 2017. *Id.*

46.     A full day later, on the afternoon of September 7, 2017, Chief Brunz walked Edwards down to Principal Shelby Balser's office and reported Jane Doe's outcry about Edwards' sexual misconduct.[59]

47.     According to Principal Balser, Chief Brunz's "verbal statement indicated that cadet [Doe] made a passing remark regarding ***sexual advances*** towards her by Colonel Edwards."[60] Principal Balser did not ask Chief Brunz or Edwards any additional questions. *Id.* She did not immediately report the outcry to School Resource Officer Paul Gonzales while her teachers were still present. *Id.* She did not notify KISD's Title IX Coordinator. And she <u>*did not even try*</u> to find Jane to make sure the child was okay or bother to notify Jane's parents about the serious situation.[61]

48.     It was after 3:15 p.m., so Principal Shelby Balser told Chief Brunz (only) to write a formal statement and leave it on her desk.[62] According to the "Time Line of Christopher Edwards Investigation" KISD created for its report to the State Board of Educator Certification, Principal Balser waited nearly two hours to inform SRO Gonzales about the outcry. *Id.* During his

---

[59] Edwards SBEC Rep. at 2711.

[60] *Id.* at 2712 (emphasis added).

[61] *Id.* at 2693–94, 2711 (the timeline Balser created for the SBEC does not mention Jane's outcry to Brunz on September 6th even though both Principal Balser and Assistant Superintendent Ivy were aware of the conversation prior to submitting the timeline); *see also* Thompson Dep. at 204:11–18, Dep. Ex. 13.

[62] Edwards SBEC Rep. at 2693–94.

deposition, SRO Gonzales struggled to remember the details of what took place at Tivy High School the year *three* Tivy teachers were dismissed due to misconduct with students.[63] KISD's written policies required Dr. Foust to reduce to writing initial reports.

49.     SRO Gonzales attended the September 2017 library meeting called by Assistant Superintendent Ivy and Principal Balser and according to him, administrators did not discuss the D'Spain outcry or her male victim(s).[64] He said the teaching staff did not appear comfortable discussing sensitive matters like what happened to Jane. *Id.* According to the former SRO, the media's involvement as well as the rumor mill and Tivy's relatively small population, everyone soon knew which students and which teachers were involved, but the SRO was not sure if that was the case when KISD held the library meeting about Jane. *Id.*

**V.      Sexual hostility towards Jane plagued Tivy's hallways, classrooms, and administrative offices after Edwards resigned.**

50.     Tivy administrators, teachers, and students picked up where Edwards left off, engaging in a sexual harassment campaign against Jane that went on for the rest of her high school career. The administration didn't consider Jane a victim of sexual abuse no matter what it told the State Board of Educator Certification.[65]

51.     The sexual harassment from the JROTC cadets (and other students) that had started the prior spring only got worse after the District finally had to dismiss Colonel Edwards after the

---

[63] SRO Dep. at 26:8–37:25.

[64] SRO Dep. at 46:8–55:21.

[65]SRO Dep. at 55:22–66:6; *see also* **Ex. B–3**, KISD 2017–2018 OCR Discrimination Rep. (Sealed) (KISD gave the Office of Civil Rights the names of seven students "reported as harassed or bullied based on sex" during the 2017–2018 school year. Jane's name does not appear on the list.).

September 7th outcry.[66] They told her she raped their favorite teacher. Made jokes about her being pregnant by her abuser. Made jokes about her having to have abortions. She eventually left JROTC. *Id.*

52.. The sexual harassment and hostility put Jane on a collision course with another one of Kerrville Independent School District's sexually abusive teachers— Mr. C the math teacher.[67] Eventually, it would force Jane out of Tivy High School and into the District's "non-traditional" Hill Country High School.

53. Jane and her parents reported the sexual harassment, slut shaming, and victim blaming by Jane's fellow cadets to Principal Shelby Balser, Vice Principal Chris Cook, and Lead Counselor Dr. Kendall Young.[68] They did nothing. *Id.*

54. From the Doe family's perspective, Jane's math teacher Aaron Chatagnier was the only person at KISD who seemed to care about helping Jane after Edwards abused her. Before becoming a math teacher, Chatagnier and Jane's father met in passing while both men worked in residential remodeling. The two men did not hang out or even have each other's cell phone numbers.[69]

55. Principal Balser denies ever having called Jane "complicit" in the relationship with Edwards.[70] Documents produced in the case corroborate Jane's allegation, not the Principal's

---

[66] *See* Doe Dep. at 153:1-185:15; Mrs. Doe Dep. at 35-50; Mr. Doe Dep. at 17–21; *see also* Shakeshaft Dep. at 70-72, 74-77.

[67] Mr. Doe Dep. at 14:9–17:5, 42:4–45:25; Mrs. Doe Dep. at 34:17–38:1.

[68] *Id.*

[69] Mr. Doe Dep. at 13:9–17:17.

[70] Balser Dep. at 178:12-179:1.

denial. On February 7, 2018, Principal Balser and Assistant Principal Cook told Chatagnier that
"<u>he</u> needed to keep <u>Jane</u> from being in his classroom at unscheduled times."[71] Also on February
7, 2018: Mrs. Doe, who was growing really worried about the environment at Tivy, sent Assistant
Superintendent Wade Ivy an email with her concerns. That email expressly reported Principal
Balser spreading rumors/stating her belief that Jane was complicit in her own sexual abuse.[72]

> been vital in her not falling apart. He has been vital in her recovery.
> However, if there are concerns by Mr. Cook or Mrs. Balser, why have they not contacted me or my husband? Why do they question [Jane Doe]? If she is not in the right place at the right time, why do they not address that? Showing up two days in a row (today and yesterday) to Mr. C's class and calling [Jane Doe] out with questions and suspicions does nothing for her. Why are they dancing around whatever it is they aren't saying?
> I know I've said quite a lot, but there is a tremendous amount that plays through your mind as you try to transition your child from 'broken' to someone who feels her future is still bright. Teachers have been a little catty about [Jane Doe's] appearance though she's never dress coded. She feels the attitude, but keeps on going forward.
> But, the ONE thing that has weighed heavily on me and my husband is that the principal of Tivy High School would dare warn a teacher of my daughter's intentions and basically communicate to him to watch out as she was complicit in what happened with Edwards. She's a child. And through minute by minute support, tears, talking, medication, she is thriving. But why, especially in this current climate, would anyone ever blame the victim?
> Thank you for reading this various and sundry collection of thoughts. We appreciate you and have from day one. You

56.    In the email a desperate Mrs. Doe asks: "What are you dancing around?" and "What are
you not telling me?". Ivy did nothing about the report even though it would meet the definition
of retaliation or sexual harassment outlined in KISD's policies like FFH.[73]

58.    The rumors about Chatagnier and Jane having a sexual relationship circulated for
months. *Id.* Administrators were aware of them as well as the harassment Jane got for being
Edwards' victim. *Id.*

59.    When Chatagnier eventually resigned, the students immediately connected his
resignation to his relationship with Jane. *Id.* They defiled school property, etching a desk with

---

[71] 2018 Chatagnier SBEC Rep.

[72] 02/07/2018 Mrs. Doe Harassment Rep.; Ivy Dep. at 70:9—77:25, 122:1-129:25; Mrs. Doe Dep. at 86:1-89:25; 02/21/2018 Post Conference Email to Ivy; *but see* Balser Dep. at 178:12—179:1 (denying statement).

[73] Ivy Dep. at 169:5-188:24.

[Jane] 2 | Tivy 0 and then posted their work to social media.[74]



## VI.   KISD's Knew about Chatagnier. It Just Didn't Want Another Scandal.

60.     The math teacher's grooming and sexually suggestive behavior toward Jane became more brazen and more frequent over the spring semester. Evidence indicates Assistant Superintendent Ivy, Principal Balser, and Assistant Principal Cook actively looked for ways to remove Jane, not Aaron Chatagnier, from Tivy's campus.[75]

61.     Dr. Shakeshaft referred to the scene Dr. Young witnessed on March 2nd as "shocking, inappropriate behavior.[76] The counselor expressed how extremely disturbed she was by seeing

---

[74] **Ex. A-29**, Email Reporting Jane v. Tivy.

[75] *See id.*; Balser Dep. at 170:1-205:22; SRO Dep. at *passim*.

[76] Shakeshaft Dep. 53-54.

Jane behind Chatagnier's desk, kneeling, looking up at him in his chair, but did not do anything to intervene. *Id.* When Young advised Balser of the incident, Balser did not notify Jane's parents.

62.     He began grooming her in November 2017 and their sexual relationship started when they followed Assistant Superintendent Wade Ivy's instructions not to be seen together on campus because Jane's reputation as the love interest of Edwards made everyone assume she was in a new romantic relationship with another teacher. On her knees behind the desk, walking in the halls, spending his conference period together alone, meeting off campus, wearing matching shirts, "we hooked up", and rumors of the same— KISD's Assistant Superintendent and the High School Principal knew about it all.[77]

63.     Additionally, Chatagnier's December 2017 email was a huge red flag that a trained educator should have picked up on.[78] The same is true about Jane's constant tardiness to Jones' class after leaving Chatagnier's class during his second period conference time. *Id.*

64.     On May 7, 2018, Kerrville Independent School District reported Chatagnier to the SBEC as it was required to do by law because he quit in lieu of termination while under a potential investigation. KISD's letter includes a timeline of events that led up to his resignation. The evidence that KISD's letter discussed revolved around times Jane went to his class whe she wasn't supposed to be there.[79] KISD then assured the SBEC: "***To be clear, there is no claim of, or evidence that a sexual or romantic relationship exists.***" *Id.*

65.     The school district's letter did not include any of the following events that happened

---

[77] *See* Ivy Handwritten Notes, Balser Notes, Wrase Notes as well as deposition testimony cited at length above.

[78] Shakeshaft Dep. at 94-95.

[79] 2018 Chatagnier SBEC Rep.

during the period discussed in the letter:[80]

— Overt, textbook grooming behaviors displayed in front of school employees with the authority to take corrective action.

— Displaying sexually suggestive physical touching displayed in front of school employees with the authority to take corrective action.

— Chatagnier's December 6, 2017 email to teacher Julie Jones (copying Balser and his department head) acting aggressive and possessive of Jane Doe and referencing both teachers' knowledge of her prior abuse.

— Mrs. Doe's February 7, 2018 email to Ivy reporting Principal Balser for calling her daughter complicit in the sexual abuse Edward advanced.

— February 15, 2018, email from Dr. Kendall Young (Kerrville ISD counselor) to Balser, forwarding Dr. Young's December 6, 2018 email to Chatagnier in which she states she is sending an "extremely upset" Jane Doe to him to comfort since he is aware of Jane Doe's prior abuse.

— Marche 2, 2018 email from Dr. Young to Principal Balser describing what Dr. Young observed the previous day: "When I entered the classroom (6th period) [Jane] was kneeling on the ground looking up to Mr. Chatagnier in his chair . . . neither of them even noticed I had entered the classroom . . . I spoke to you [Balser] about the situation because she is not supposed to be in his classroom 5th-7th as he has classes during that time . . . My other concern is that [Jane] is forming an unhealthy dependency on a staff member who is unable to set appropriate boundaries with her. I felt highly uncomfortable when I walked into the classroom during 6th period as she was kneeling closely to his chair. . . ."

— Assistant Principal Ivy summoning Jane Doe and her parents for a meeting in which Jane needed to start meeting Chatagnier for tutoring off campus and suggested the library study rooms at nearby Schreiner's University because Jane meeting with the teacher at school had the potential "to make *Kerrville ISD look bad*." (February or March 2018)

— Kerrville ISD employees with authority to take corrective action witnessing Chatagnier and Jane Doe wearing matching t-shirts from car show that took place

---

[80] Ivy Dep. at 211-233 (with exhibits); Balser Handwritten Notes Chatagnier Agreement re Boundaries; Balser Notes re: Chatagnier.

the prior weekend. (Early April 2018)

— A student reporting to Balser that she had seen Jane say "we hooked up" during class on the day the shirts matched.

66.    The District's expert testified that the following statement was true with respect based on his review of the evidence:[81]



> "KISD should have learned of 0 more boundary crossing incidents before they suspected sexual abuse."

Agree

Disagree

KISD's Retained Witness
David P. Thompson, Ph.D
April 24, 2023

Exhibit 55

## VII.    Even Dr. Thompson Agreed: "KISD had substantial reasons to suspect sexual misconduct by Chatagnier."[82]

67.    KISD should have been on high alert to watch after Jane Doe being vulnerable to recurrences of sexual abuse after discovering what was done to her.[83] The District demonstrated a silo mentality when it came to collecting and investigating claims of sexual harassment.[84]

---

[81] Thompson Dep. at 207:1–244:15, Dep. 5 (including cited exhibits)(Dr. Thompson also agreed: (1) KISD objectively knew that an unhealthy dependency existed between –Jane Doe and Chatagnier as early March 2nd, 2018; and (2)"In hindsight" Dr. Thompson agreed that he could point to no effective action –action KISD took to prevent the sexual abuse of Chatagnier after learning of the abuse by their other employee, Edwards.).

[82] Thompson Dep. at 204:5–205:10, Dep. Ex. 14.

[83] Id. at 207:1-208:25, 222:17-228:25, Dep. Exs. 18, 35-43; Shakeshaft Dep. at 50:1-58:15, 146:3-150:4; SRO Dep. at 55:22- 56:25, 91:11-99:22, 107:25-113:25, 118:1-134:1; see also Cook Dep. at 127:6-138:5.

[84] See e.g. SRO Dep. at 132:8-21, 166:19–167:24.

68.    Assistant Principal Cook, Dr. Young, and SRO Gonzales each denied having knowledge of important red flag events during their depositions.[85] For example, SRO Gonzales testified that KISD had information that it wasn't sharing with the police:

> Q. If -- if a student informed Principal Balser on April 27th of 2018 that the student witnessed [Jane] say she hooked up with the math teacher, that they were wearing matching shirts from a meeting they had outside of school, would you expect Principal Balser to inform you of that?
>
> *  *  *
>
> A. I would say yes. But I don't know all the information as to what was implied by hooking up, was -- whether this student was questioned, what does hooking up mean. You know, I don't know any of that information. So if they were implying that they had sexual relations and that's what hooking up meant to this particular student, then yes, most definitely.[86]

69.    Assistant Superintendent Ivy and Principal Balser collected all of the information related to Mr. C's ongoing relationship with Jane. On March 2, 2018, Dr. Kendall Young witnessed an event that left her so concerned that she immediately found Principal Balser to describe what she had seen and followed that description with a lengthy email detailed above. They had the rumors, missing the same class (Career) to stay in his conference period, ignoring directives given to him about boundaries, the aggressive December 2016 email, matching shirts, an off-campus excursion, tutoring at the library off campus, and a report that Jane had said they "hooked up."

---

[85] SRO Dep. at 132:8-21, 166:19–167:24.

[86] SRO Dep. at 166:19–167:24.

**VIII**.    **KISD Quietly Swept Jane Over to its Non-Ranking, "Non-Traditional" High School.**

70.    Jane Doe walked into Kerrville ISD's Tivy High School on the first day of her freshman year with a goal and a plan for how to meet it.[87]  At age 14, she already knew what she wanted to be when she grew up—an officer in the United States Air Force. *Id.* She planned to take the Air Force Junior Reserve Officer Course all four years of high school and earn a scholarship for the United States Air Force Academy or another university with an ROTC. *Id.*

71.    Tivy High School's Air Force JROTC program was recognized as one of the best in the country when Jane joined the program as a freshman.[88] Jane excelled under the instruction of Captain Paul Hill and Chief Fred Brunz, who oversaw the program at the time.[89] The summer after ninth grade, Jane was recognized as Honor Graduate and Academic Scholar of the Staff Leadership Course at the AFJROTC's Annual Cadet Leadership Course. *Id.* Based on Jane's accomplishments, Tivy's JROTC instructors promoted Jane to the rank of flight sergeant for her sophomore year. *Id.* She also took on the role of Photo Assistant ("PA") for the JROTC program.

72.    The harassment she received after Edwards resigned was unbearable. Instead of addressing the sexual harassment, administrators recommended she quit.[90] As the administrators continued to worry about how it looked for the school when Jane interacted with Mr. C, they also started considering other ways to solve that problem.

---

[87] Doe Dep. at 10:22–11:15, 10:22–11:15, 15:13–17:6.

[88] *Id.* at 18:19–20:19; *see also* Arnold, *AFJROTC duo named 'Instructors of the Year'*, Hill Country Community Journal, May 16, 2016 (available at https://www.hccommunityjournal.com/article_7d7d8f20-16de-11e6-a21c-1bf81facb4ab.html) (last visited Jul. 9, 2023).

[89] Doe Dep. at 17:7–18:18, 20:5–21:17, 29:23–30:3, 31:23–34:6, 36:19–25; **Ex. B–1**, Jane Doe Freshman ROTC Photograph; **Ex. B–2**, KISD JROTC Jane Doe Recognition (noting 292 cadets from seventeen schools from the region competed in the CLC).

[90] *See* Young Dep. at 99- 100, 148-158.

73.    On April 11, 2018, Kerrville ISD added an "at risk" label Jane Doe's records.[91] It said she was at risk for having a grade lower than 70 in at least two courses during the prior or current semester. Jane Doe's class rank generated the exact same day was 47th out of 353 students.



74.    The District's deliberate indifference to and participation in the sexual harassment campaign finally broke Jane. KISD had just spent weeks pushing her to leave Tivy High School, transfer to its "non-traditional" high school, and graduate as soon as possible. And Jane had spent those same weeks resisting the District's efforts to get her out of Tivy.[92]

**IX.    KISD's Board rubber-stamped premade policies and depended on administrators to demonstrate District policy through their actions.**

75.    The KISD Board of Trustees approves policies, monitors the school district's academic progress, and sets the district's academic goals.[93] KISD's superintendent works directly for the school board, taking care of the day-to-day operations from "a high level point of view." *Id.* At

---

[91] *See* **Ex. A-33**, Doe Grades by Semester; **Ex. A-31**, At Risk Skyward; **Ex. B-4**, Hill Country HS at Risk; **Ex. B-5**, College Admission Records; Ivy Dep. at 223:21–235:22.

[92] Doe Mr. Doe Dep. at 28:15–30:9; **Ex. A–27**, 04/11/2018 Emails with Brunz.

[93] Ivy Dep. at 16:8–21:7.

KISD, assistant superintendents, directors, and principals "implement[] the day-to-day operations" for the district. *Id.* It has three assistant superintendents who oversee: (1) curriculum and instruction, (2) business and finance, and (3) administration and human resources. *Id.*

76.    KISD's board selected Wade Ivy to serve as Assistant Superintendent of Administration and Human Resources in 2012.[94] His responsibilities included ensuring the District had "sound processes" for hiring and good appraisal systems. *Id.* And, when "a person need[ed] ***to be moved out of [KISD]*** for some reason," Assistant Superintendent Ivy was the person responsible for ensuring removal went smoothly.[95] Ivy also either oversaw or lead personnel investigations. *Id.*

77.    In his capacity as the assistant superintendent in charge of administration, Ivy made presentations *to the board* when the Texas Association of School Boards (TASB) recommended policy updates.[96,97] TASB provides policy services, among other things, to Kerrville ISD. *Id*. In doing so, TASB gives the district model policies that KISD's board usually adopts with little or no alteration. *Id.*

78.    Superintendent Dr. Mark Foust was KISD's Title IX Coordinator.[98] According to KISD's written policies Dr. Foust had several non-delegable responsibilities when sex discrimination

---

[94] *Id.* at 34:10–38:14.

[95] *Id.* (emphasis added); *see also* Ex. A–8, 09.18.2017 FW: Letter of Resignation Email ("Congratulations on ***another*** professionally handled personnel issue that in a less experienced school administrators [sic] hands could have been a disaster.").

[96] Ivy Dep. at 25:5–33:10, 35:19–37:23.

[97] Assistant Superintendent Ivy's deposition clearly states he presented TASB presentation to the board. He says something very different (and incongruent) in the Declaration of Wade Ivy attached to KISD's motion. Ivy's Declaration states: "One of the ways Kerrville ISD provides training to its employees, staff, students, and community members is via Powerpoint presentations." Doc. 51–4, Wade Ivy Dec. ¶ 10. Further, as noted in Jane's concurrently filed objections, Ivy's declaration cannot be used to admit the series of unlabeled presentations that are filed as Docs. 51-25 through 51-31.

[98] Ivy Dep. at 56:1–97:4.

reports.[99] He didn't follow them, and neither did Balser, Cook, Ivy, or Young. *Id.*

## KISD'S WITNESSES HAVE REAL CREDIBILITY ISSUES

79.     Example One: SRO Paul Gonzales, a third-party witness, gave the first deposition in the case.[100] Gonzales prepared for his deposition by meeting with KISD's attorney and all of its employee witnesses to talk about his testimony. *Id.* (KISD's attorney does not represent Gonzales.) During the deposition, Gonzales went to lunch with KISD's attorney and Assistant Superintendent Wade Ivy, but they "allegedly" did not discuss his testimony. *Id.*

80.     The former SRO also made a surprise allegation of unprofessionalism against Jane's attorney Amos Barton. *Id.* Mr. Barton, the former elected Kerr County District Attorney, and Constable Gonzales have enjoyed a good professional relationship for fifteen years. *Id.* The Constable claimed that Mr. Barton was unprofessional because he asked Gonzales direct, non-tricky questions about KISD's treatment of Jane. *Id.* The conversation happened in Gonzales' own office after he left KISD's employment, and Gonzales knew Mr. Barton represented Jane in this litigation at the time of the discussion. *Id.*

81.     Gonzales spoke freely at the time and confirmed KISD administrators considered Jane to blame for Edwards' abuse and Mr. C's subsequent inability to resist her advances. Gonzales' memory of the conversation that allegedly caused him much offense was conveniently fuzzy, he claimed he could not remember specifics but could not deny the statements either. *Id.* Similar allegations of unprofessionalism were not lodged about KISD's defense counsel preparing

---

[99] Thompson Dep. at 28-97, 102-115.

[100] SRO Dep. at 57:11-66:6, 112:3-118:25, 137:2-149:19.

Gonzales for his deposition in front of his former colleagues who had a vested interest in swaying the Constable away from what would be damning testimony, his follow-up preparation call with defense counsel, or his mid-deposition lunch date with that attorney and the representative of KISD observing Gonzales' deposition. *Id.*

82.     <u>Example Two</u>: KISD's witnesses and its two former employees <u>consistently</u> responded *I don't remember* and *I can't recall the specifics* (or similar phrases) when asked about the conversations they had about Jane at the time of the underlying events.[101] When asked for at least their best recollections, no matter how vague, they often declined to answer and claimed to answer such a request based on an imperfect memory amounted to speculation.

83.     KISD's waiver of attorney-client privilege in the meeting above and a witness looking to notes during deposition led Jane to the source of that "I don't know perfectly so I can't answer at all" mantra. Both Balser (white)and Cook (blue) produced handwritten notes from their deposition preparations with lawyers for KISD. Their notations were nearly identical.



---

[101] Examples of this behavior can be found in the depositions cited below. SRO Dep. at 73:4-25, 115:1-117:25, 154:9-155:13; Balser Dep. at 144:41-148:25, 221:1-228:20; Ivy Dep. at 169:5- 169:24, 188:24:-19:7, 198:10-199:22, Dep. Ex. 5 (KISD's 9/13/2017 public letter individually marked as an exhibit to this appendix), Dep. Ex. 7; Cook Dep. at 30:4-33:22, 45:11-25, 51:1-56:23, 128:6-16, 130:2-134:25; Young Dep. at 34:3–14, 36:24-37:8, 45:2-8, 50:17-51:9, 145:1-1, 206:1-207:25.

84.   <u>Example Three</u>:  Dr. Kendall Young also testified after leaving her position with KISD. KISD delayed informing Jane it would not be representing her for purposes of the deposition, which delayed getting her testimony. During deposition, Plaintiff asked Dr. Young if teachers made hostile comments about Jane having relationships with male teachers during class after her dismissal. Before Dr. Young could answer, KISD began instructing her not to answer even though she was a third-party witness. When Jane objected, KISD's counsel started giving Dr. Young unsolicited legal advice.[102]

## STATEMENT OF DISPUTED FACTS

Jane Doe disputes the facts set out belove. In some instances, Jane's Statement of Material Facts provides additional details or context related to the facts that she does not dispute. The facts identified as disputed below cover additional topics which are not specifically or directly addressed in Jane's Statement of Material Facts.

9.   During the spring of 2017, Jane continued to interact with Edwards in the presence of other students and staff members on a daily basis, but nothing occurred in front of others that made her uncomfortable. Ex. A-1, 42:6-13.

### DISPUTED:

Soon the hugs began and quickly they became an everyday occurrence.[103] They went on for several minutes and made Jane uncomfortable. *Id.* The Colonel hugged Jane in the JROTC room, in the JROTC offices, and in the JROTC closet. *Id.*

---

[102] Young Dep. at 180:1–184:19, 206:10–207:25, Dep. Ex. 1.

[103] Doe Dep.  at 35:18–41:8, 45:25–48:24, 50:14–16, 57:20–59:13.

But that wasn't the only place the hugs happened.[104] They happened in front of Chief Brunz. *Id.* He told Assistant Superintendent Ivy and Principal Balser that Colonel got "a lot of hugs" from Jane and that "Brunz felt uncomfortable with it." *Id.* Chief Brunz told Edwards it was unprofessional and that "he had enough." *Id.* During her deposition, Jane described one of the hugs Chief Brunz witnessed: "One time we were hugging and Chief Brunz walked into the office, and he quickly got off of me."[105] The Colonel's hugs also occurred in front of Jane's fellow cadets throughout Jane's sophomore year.[106] Even those public hugs lasted between twenty and thirty seconds. *Id.* They were also exclusively given to Jane. *Id.*

14.     Jane says that Edwards would whisper that he loved her, and she would whisper back that she loved him. Ex. A-1, 81:20-22.

**DISPUTED:**

Jane disputes this statement as incomplete. According to her deposition, Edwards also made the statement "I love you" while hugging her with his knee up to her vagina and rubbing. Doe Dep. at 80:10-81:25.

15.     Jane says there was an incident where Edwards grabbed the back of her overalls and lifted her up giving her a wedgie and exposing her rear end. Ex. A-1, 68:2-69:11. Another student

---

[104] *Id.; see also* Edwards SBEC Rep. at 2711 (KISD's administrators chose not to record their interview with Brunz and not to include any information about when Brunz spoke to Edwards. However, the conversation must have occurred *before* KISD provided any educator misconduct training to Tivy teachers. That training occurred *after* Jane's outcry to Brunz. KISD's yearly training, if its representations based on disclosing screenshots from 2021-2022, focused on workplace harassment.)

[105] Doe Dep. at 76:11–13.

[106] *Id.* at 58:11–13, 60:4–62:2. (Sitting in silence for a full thirty seconds provides context to understand Jane's testimony and the inferences reasonable jurors observing such a demonstration would draw from this evidence.)

was present, but Jane says the student did not see the full event. Ex. A-1, 69:3-7. Jane told Edwards he could not do that and that it was not fair. Ex. A-1, 68:21-69:2. Edwards took Jane to the ROTC office and started crying and saying that he would never hurt her. Ex. A-1, 69:8-11.

<u>DISPUTED</u>:

Jane did not say Austin Stornelli, the student, did not see the full event. She said that Stornelli "claimed he did not see the full event" but also that he heard the event. Doe Dep. at 67:10-69:21.

16.     There were no further physical interactions between Jane and Edwards after the end of her sophomore year. Ex. A-1, 85:15-19.

<u>DISPUTED</u>:

Edwards continued his sexually suggestive conduct in numerous phone calls made to Jane's home during the summer. Doe Dep.71:15-73:23.

17.     At the beginning of her junior year, Jane realized how inappropriate their relationship was. Ex. A-1, 82:18-24. Jane told Edwards to leave her alone and to treat her no better or worse than any other cadet. Ex. A-1, 82:18-24. Edwards began getting upset with her and treating her poorly. Ex. A-1, 86:1-8. On September 6, Jane went from the ROTC classroom to the ROTC office and told Chief Brunz she needed to have a conversation with him and Col. Edwards. Ex. A-1, 86:1-15. Jane, Brunz, and Edwards had a conversation in the ROTC office in which Jane disclosed the existence of an inappropriate relationship between her and Edwards without disclosing the specific occurrences. Ex. A-1, 89:6-90:11.

<u>DISPUTED</u>:

Jane disputes this statement to the extent it conflicts with the evidence she

outlined above regarding the events of September 6–8, 2017.

18.     Up until this point in time, Jane had never disclosed anything about the inappropriate relationship other than to someone she worked with away from school. Ex. A-1, 91:9-12. After the conversation with Brunz and Edwards, Jane went to class and then asked to be excused to talk to her mom via cell phone. Ex. A-1, 92:22-93:8. Jane describes that she "emotionally vomited" everything that happened in the phone conversation with her mom. Ex. A-1, 92:10-93:13.

<u>DISPUTED</u>:

Jane isn't the only person who could supply KISD with actual knowledge of this sexual misconduct. KISD had actual knowledge of Edwards' ongoing educator sexual misconduct from the time it received the reports of students talking about the instructor having oral sex with Jane in May 2017. Additionally, as discussed above both SRO Gonzales and the Chief observed interactions between Joe and Edwards that they associated with inappropriateness or promiscuity (according to the SRO).

21.     Jane testified about an incident where a student was teasing her about allegedly performing oral sex on Edwards which was untrue. Ex. A-1, 98:2-99:1. Jane immediately told and the student was expelled from ROTC. Ex. A-1, 98:2-99:1.

<u>DISPUTED</u>:

What happened was not "teasing". It was sexual harassment. It was a male student saying in front of other students that Jane was making knee pads to go under her knees while using her mouth to sexually gratify the group's teacher. From Jane's statement:

> While waiting after school in the JTRO I was using school glue and I got some on my knees. [Male classmate] started that I was 'making pads for Colonel when I would go down on him and that glue looked like the aftermath when the Colonel was finishing with me.'[107]

It was an aggressive statement. *Id.* One meant to demean and embarrass. *Id.*

23    Jane responded to several questions during her deposition that Chatagnier did not act toward her in a manner that was inappropriate until the two of them began to meet outside of school. Ex. A-1, 115:1-6, 118:20-25, 132:24-133:2. Later Jane said she remembered that Chatagnier kissed her on campus at Tivy High School and tried to pull her pants down after she and Chatagnier had started going to Schreiner. Ex. A-1, 152:25-153:8. Jane told him to stop. Ex. A-1, 152:25-153:8. No one else was around, and Jane never reported this incident. Ex. A-1, 153:9-13. Indeed, Jane acknowledges that she never reported any inappropriate relationship with Chatagnier to anyone at KISD. Ex. A-1, 153:14-22.

DISPUTED:

The Doe family testified that they were sent to tutor at the college by Ivy. It was also when the nature of their relationship changed.

EXHIBITS SUBMITTED

Jane submits and incorporates the following exhibits for all purposes. Pursuant to Federal Rule of Civil Procedure 5.2, Local Rule 5.2, and this Court's Standing Order, Jane's exhibits have been redacted to preserve her anonymity as well as the anonymity of any other individuals reported to be victims of educator sexual misconduct and/or sexual harassment in all

---

[107] *See* Edwards SBEC Rep. at 2704; Cook Dep. at 102:24–105:17.

instances that doing so was practical.[108] Unredacted copies are being served on Defendant via email A separate sealing motion has been concurrently filed on a limited number of exhibits. Finally, some exhibits are excerpted from larger documents to make navigating the record easier. Such exhibits have been identified as "Excerpts" below.

**REDACTED/PUBLIC**

**Exhibit A**        *Declaration of Heather Lynn Long*

**Exhibit A-1**        KISD Edwards SBEC Report

**Exhibit A-2**        2018 KISD Chatagnier SBEC Report

**Exhibit A-3**        KISD D'Spain SBEC Report

**Exhibit A-4**        2020 KISD Chatagnier SBEC Report

**Exhibit A-5**        David P. Thompson, Ph.D. Deposition

**Exhibit A-6**        Charol Shakeshaft Ph.D. Deposition

**Exhibit A-7**        Assistant Superintendent Wade Ivy Deposition

**Exhibit A-8**        Assistant Principal Chris Cook Deposition

**Exhibit A-9**        Principal Shelby Balser Deposition

**Exhibit A-10**        SRO Paul Gonzales Deposition

**Exhibit A-11**        09/13/2017 Public Disclosure Letter

**Exhibit A-12**        09/15/2017 Public Disclosure Letter

**Exhibit A-13**        2017–2018 KISD School Calendar

**Exhibit A-14**        12/06/2017 Chatagnier Email re Jane

---

[108] White redactions with descriptive text overlay such as "Jane Doe", "Jane", "Mr. Doe", or "Mrs. Doe" were made by Jane. The black redactions and redaction explanations written in red were made by KISD and produced during discovery. Finally, KISD wrote the sentences typed blue that appear on some of the exhibits with handwritten notes prior to producing them in discovery.

**Exhibit A-15**      Kendall Young, EdD Deposition

**Exhibit A-16**      12/08/2017 Balser Mtg AC Email

**Exhibit A-17**      02/15/2018 Young Fwd. Dec. 2017 Email

**Exhibit A-18**      03/02/2018 Kneeling Behind Desk Report

**Exhibit A-19**      02/07/2018 Mrs. Doe Harassment Reports to Ivy

**Exhibit A-20**      02/21/2018 Mr. Doe Post Conference Email

**Exhibit A-21**      KISD Boundaries Contract Signed

**Exhibit A-22**      09/20/2017 Library Meeting Notes

**Exhibit A-23**      Balser English Student Talk

**Exhibit A-24**      Mrs. Doe Deposition Excerpts

**Exhibit A-25**      Mr. Doe Deposition Excerpts

**Exhibit A-26**      Ivy DFPS Training Request

**Exhibit A-27**      04/11/2018 Emails with Brunz

**Exhibit A-28**      01/10/2022Balser Notes

**Exhibit A-29**      Doe 2, Tivy 0

**Exhibit A-30**       KISD R- 2nd RFP (excerpts)

**Exhibit A-31**      Redacted "At Risk" Skyward

**Exhibit A-32**      Sept. 2017 Snap Chats

**Exhibit A-33**      Doe Grades by Semester

**Exhibit A-34**      Ivy Handwritten Edwards Notes

**Exhibit A-35**      KISD Friday Reports

**FILED UNDER SEALED MOTION FOR LEAVE**

**Exhibit B**      *Declaration of Heather Lynn Long*

**Exhibit B-1**      Jane Doe Photograph

**Exhibit B-2**      KISD Recognition

**Exhibit B-3**      KISD 2017–2018 OCR Discrimination Report

**Exhibit B-4**      Email Correspondence Balser and Young

**Exhibit B-5**      College Admissions Records

**Exhibit B-6**      Balser Handwritten Notes 04/2018

**Exhibit B-7**      Ivy Handwritten Notes 04/2018

**Exhibit B-8**      Balser Typed Notes

**Exhibit B-9**      Academic Records

**Exhibit B-10**     Counseling Notes

**Exhibit B-11**     Ivy Handwritten Notes 09/2017

**Exhibit B-12**     Police Record Excerpts

**Exhibit B-13**     Tivy Teacher Employment Records

**Exhibit B-14**     Tivy Teacher Employment Records

**Exhibit B-15**     Demonstrative Excerpt Doe Deposition